**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sammy G. DAILY and Frederik A.
Figge, Defendants–Appellants.**

**Nos. 88–1626, 88–1627 and 89–3333.**

United States Court of Appeals,
Tenth Circuit.

Dec. 10, 1990.
Order on Rehearing March 1, 1991.

Sheryle L. Jeans, Atty., U.S. Dept. of Justice, Kansas City, Mo. (Benjamin L. Burgess, U.S. Atty., D. Kan., Kansas City, Mo., and Michael J. Dittoe, Atty., U.S. Dept. of Justice, with her on the briefs), for plaintiff-appellee.

Steven M. Dickson, Dickson & Pope, P.A., Topeka, Kan., for defendants-appellants.

* Honorable Frank H. Seay, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

Before HOLLOWAY, Chief Judge, EBEL, Circuit Judge, and SEAY *, Chief District Judge.

HOLLOWAY, Chief Judge.

Defendants-appellants Sammy Daily and Frederik Figge were convicted on one count each of conspiring, in violation of 18 U.S.C. § 371, to commit offenses under 18 U.S.C. §§ 1001 and 1343. Daily and Figge make several claims of error. In view of our ultimate disposition of these appeals, we only deem it necessary or appropriate to address eight contentions here: (1) whether the trial court lacked subject matter jurisdiction to impose judgment on Daily and Figge; (2) whether the indictment insufficiently charged the offense at issue, or was improperly broadened by the trial court's instructions; (3) whether the trial court erred in failing to hold an evidentiary hearing as to the validity of a search warrant; (4) whether the government improperly failed to provide Daily and Figge with exculpatory evidence; (5) whether the trial court erred in instructing the jury as to materiality under 18 U.S.C. §§ 1001 and 1343; (6) whether there was a fatal variance between the indictment and the proof as to the alleged existence of multiple conspiracies, and whether the trial court erred in failing to give an express multiple-conspiracy instruction; (7) whether the trial court erred in failing to instruct the jury with respect to substantial character evidence addressed by both defendants; and (8) whether there was sufficient evidence to support the defendants' conspiracy convictions. Due to prejudicial error on issue (7), we must reverse and remand for a new trial.

## I. BACKGROUND

### A. *Facts*

The facts underlying these appeals are complicated. We briefly summarize them here, and address particular facts in greater detail in disposing of Daily and Figge's claims of error.

Essentially, the government alleges that Daily and Figge (as well as others) [1] conspired to defraud the Coronado Federal Savings and Loan (CFSL) and the Indian Springs State Bank (ISSB), both financial

1. In addition to Daily and Figge, three other persons were formally charged with conspiracy under 18 U.S.C. § 371 in connection with the

institutions in Kansas, by recruiting limited partners for a number of land investment partnerships, and by having those limited partners apply for loans from ISSB or CFSL. ISSB and CFSL loaned the money with the understanding that they would receive funds equal to double the loan amounts through purchases of certificates of deposit (CDs). The loan proceeds went into partnership accounts, and allegedly were then used for the personal benefit of the co-conspirators.

According to the government, this plan required the participation of CD owners (generally credit unions), limited partnership investors, and financial institutions (ISSB and CFSL). Credit unions were persuaded to purchase CDs from ISSB and CFSL through First United Fund (FUF), a money brokerage firm owned and operated by Mario Renda, an alleged co-conspirator. In what were dubbed "special deals" or "Joe Davis deals," FUF account executives would inform credit unions that financial institutions like ISSB and CFSL were paying a higher rate of interest than was actually the case. When a credit union would notify FUF that a financial institution was not paying the expected interest rate, FUF would send out a standard letter of apology, and would make up the difference to the credit union. In turn, FUF would collect the interest-rate differential from third parties who were told that they were paying a fee for FUF's brokerage services.

Daily and Figge were actively involved in the recruitment of limited partner investors. In connection with their recruitment activities, however, Daily and Figge allegedly made a number of false statements. In order to participate in the real estate venture, investors had to apply for loans from ISSB or CFSL and deposit the proceeds in one of the limited partnership accounts. To induce their participation, among other things, Daily and Figge allegedly told the investors that the applications for the loans were a mere formality and would not be scrutinized by the bank and that all debts need not be listed on the applications; that the partnerships would make all the loan payments and that investors would have no personal liability; that condominiums, which could be sold in short order, would be transferred into one of the partnerships; that there were adequate reserves set aside to offset any negative cash flows; and that investors would not be required to make any further contributions. According to the government, none of these promises was given truthfully.

ISSB and CFSL were induced to make the loans by assurances that investors were qualified to borrow. However, according to the government, loan applications contained false information. In some instances, investors were told by Daily or Figge (or an alleged co-conspirator, Franklin Winkler) to beef up their applications by adding false statements. In other cases, Daily or Figge altered or completed the applications such that they evidenced material falsehoods without the investors' knowledge. In this regard, Daily and Figge are said to have routinely asked investors to fill out and deliver to them draft loan applications and signed, blank copies.

The government alleges that much of the money gained from this scheme was retained by Daily and Figge for their personal use and benefit. For the most part, says the government, no payments were ever made on these loans, and in fact the partnerships had the effect of solving defendants' cash flow problems on properties without divesting them of ownership of the properties. The government alleges that properties were not transferred to the limited partnership as promised, and therefore, the partnerships had no assets. Moreover, the properties were fully pledged as collateral on another obligation and were eventually foreclosed upon.

For their part, Daily and Figge contend that they were facilitating legitimate land investment deals. They maintain that the plan fell apart because the Federal Deposit Insurance Corporation (FDIC) and the Federal Savings and Loan Deposit Insurance Corporation (FSLIC) unexpectedly gave special scrutiny to the loans because they were associated with brokered deposits, and because many of the loans were "out of territory" (*i.e.*, many of the partners were from Hawaii). Subsequently, they claim that ISSB called all the loans even though payments on the loans were current. They assert that they refused to pay on the loans because of previous agree-

financial scheme discussed in text: Mario Renda, Leslie Winkler, and Franklin Winkler. I R., Doc. 1, at 31 (Count 30). Renda pled guilty to two substantive counts of wire fraud. The Winklers fled the country and are the subject of an extradition request by the government. Leslie Winkler is presently believed to be deceased. *See* Brief of Appellee at 2.

ments with ISSB, and that "[t]he disinformation from the FDIC and the bank's actions was *severe* and ruined Daily's real estate firm, affecting his [and Figge's] ability to perform." Brief of Appellants at 4–5 (emphasis in original).

### B. *Procedural History*

Daily, Figge, and three others were indicted by a grand jury on a 34–count indictment. These counts mostly pertained to wire fraud (18 U.S.C. § 1343). Count 30 charged Daily and Figge with conspiring, in violation of 18 U.S.C. § 371, to commit wire fraud, and to submit false statements as to matters within the jurisdiction of a federal agency (18 U.S.C. § 1001). Neither Daily nor Figge was charged with a substantive false statement violation under § 1001. However, Daily was separately charged in another count with violating 18 U.S.C. §§ 1014 and 2, making false statements to influence a federally-insured bank.

The case was tried before a jury over a period spanning approximately two months. The jury returned guilty verdicts against Daily and Figge, but only as to the conspiracy count (Count 30). Daily was sentenced to five years' imprisonment and, Figge was sentenced to three years' imprisonment. Both were ordered to pay a $10,-000 fine and a $50 assessment to the Crime Victims Fund. In Numbers 89–1626 and 89–1627, respectively, Daily and Figge timely appealed their convictions and sentences.[2]

## II. DISCUSSION

### A. *Jurisdiction*

In a pro se supplementary brief, Daily and Figge first contend that their convictions cannot stand because the government failed to establish that they committed an offense within the "territorial jurisdiction of the United States." 18 U.S.C. § 7. In this regard, they assert that the geographical area referred to in the quoted phrase is more limited than the geographical area commonly thought of as constituting the

United States. It was thus allegedly incumbent on the government in the instant case to prove "United States ownership of the property in question [or] a State cession of jurisdiction." Supplementary Pro Se Brief of Defendants–Appellants at 7.

This argument, however, is wholly without merit. Precisely the opposite is true: "The federal government has territorial jurisdiction over certain conduct which occurs outside of the fifty states." 2 W. LaFave & J. Israel, *Criminal Procedure* § 16.2, at 343 (1984). Accordingly, we conclude that the government had no obligation to make a jurisdictional showing as asserted by Daily and Figge (*i.e.*, United States ownership or State cession), and the criminal charges were properly before the district court.

### B. *Sufficiency of the Indictment*

Daily and Figge make several arguments that challenge the indictment as insufficient. Generally, they argue first that Count 30 fails to state an offense and, second, that the district court improperly broadened the indictment through the use of jury instructions. We reject both contentions.

### 1. Statement of the Offense

Daily and Figge contend that Count 30, which charged them with conspiracy, fails to allege the elements of the offense, and thus fails to allege an offense. They say there is a variance between the wording of the indictment and the wording of 18 U.S.C. § 1001 (one of the underlying crimes).

■ It is not necessary that the wording of a statute be parroted in an indictment. We recently noted that an indictment is sufficient if (1) it "contains the elements of the offense and apprises the defendant of the charges he must meet," and (2) "the defendant would be protected against double jeopardy by a judgment on the indictment." *United States v. Mobile Materials, Inc.*, 871 F.2d 902, 906 (10th Cir.1989), *opinion supplemented on reh'g*, 881 F.2d

2. In our Number 89–3333, this court granted both defendants release on bail pending appeal the day following argument before us. In its Order denying Daily and Figge's motion for release on bail, the district court had also denied Daily and Figge's motion for relief under 28 U.S.C. § 2255. The § 2255 motion—filed by Daily and Figge's counsel—sought essentially the same relief as the bail motion (*i.e.*, release

pending appeal). The district court correctly denied the § 2255 motion for want of jurisdiction, citing Daily and Figge's pending appeals on the merits. There is no suggestion in the record that Daily and Figge ever attempted to challenge the district court's § 2255 decision on appeal. And, in view of our reversal in our Number 89–3333 on bail, the matter is moot in any event and is dismissed.

866 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); *see Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962) (citations omitted).

Given the specific events it alleges, the indictment certainly protects Daily and Figge from being tried, or in other respects placed in jeopardy, twice for the same offense. Accordingly, the double jeopardy factor is not a concern here. We proceed to determine whether the indictment adequately charges the conspiracy offense upon which Daily and Figge were convicted. Specifically, we must determine whether the indictment alleges the elements of the charged offense and is otherwise sufficient to provide defendants with notice.

■ As for the elements of the charged offense, we note initially that this is an indictment for *conspiracy* to violate §§ 1001 and 1343. Thus, the indictment must contain the essential elements of conspiracy. It is also necessary that the indictment contain "the essential elements upon which the underlying offense rests." *Nelson v. United States*, 406 F.2d 1136, 1137 (10th Cir.1969). Yet, we have noted that in a prosecution for conspiracy, the elements of the underlying offense need not be charged with the same degree of specificity as would ordinarily be required in a prosecution based on the underlying offense. *Id.*

We first examine the elements of conspiracy. Under 18 U.S.C. § 371, "[a]n illegal conspiracy is 'an agreement between two or more persons to commit one or more unlawful acts, and is complete when one or more of the conspirators knowingly commit an act in furtherance of the object of the agreement.' " *United States v. Parnell*, 581 F.2d 1374, 1379 (10th Cir.1978) (quoting *United States v. Thomas*, 468 F.2d 422, 424 (10th Cir.1972), *cert. denied*, 410 U.S. 935, 93 S.Ct. 1389, 35 L.Ed.2d 599 (1973)), *cert. denied*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979); *United States v. Gonzalez*, 797 F.2d 915, 916 (10th Cir.1986). Of course, the defendant must have entered into the conspiracy willfully. *See United States v. Jacobson*, 578 F.2d 863, 867 (10th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 324, 58 L.Ed.2d 327 (1978); *United States v. Sherman*, 576 F.2d 292, 296 (10th Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259 (1978); *see also United States v. Hines*, 696 F.2d 722, 733 (10th Cir.1982).

Five elements, then, must be present in an indictment charging a conspiracy under 18 U.S.C. § 371: there must be an agreement; the purpose of that agreement must be to break the law; there must be an overt act; the purpose of the act must be to further the conspiracy; and the defendant must have entered the conspiracy willfully. Even a cursory reading of Count 30 establishes that all five elements appear in the indictment.

■ As for the elements of one underlying substantive offense, that under 18 U.S.C. § 1001, Daily and Figge contend that the indictment failed to inform them that they were being prosecuted for making false writings and documents, and that it further failed to inform them that they were being prosecuted for making false statements knowingly. We disagree. Count 30 alleges that Daily and Figge conspired:

> To knowingly and willfully conceal and cover up material facts by tricks, schemes and devices, and to make false and fraudulent statements and representations, in matters within the jurisdiction of the Federal Deposit Insurance Corporation and Federal Savings and Loan Insurance Corporation, agencies of the United States, in violation of Title 18, United States Code, Section 1001....

I R., Doc. 1, at 31. On the other hand, § 1001 reads as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, *or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry*, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (emphasis added).

Thus, the indictment does not contain the terms of the last part of the statute which deals with writings. We have held, however, that the elements of § 1001 are as follows: (1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of a federal agency; and (5) the statement was material. *United States v.*

*Irwin,* 654 F.2d 671, 675–76 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). It is clear from this listing of elements that we have not distinguished between false oral statements and false written statements. Consequently, Daily and Figge's reliance upon that distinction is misplaced.[3]

Further, we reject Daily and Figge's contention that the indictment does not charge that they knew of the falsity of the statements. True, as to this element of the § 1001 offense, the indictment is poorly crafted. Count 30 does not itself allege that Daily and Figge knew that their statements were false. Count 30, however, does expressly incorporate information from Counts 1 and 14, which do contain language alleging that they knew of the falsity of certain statements made. As relevant here, Count 14 states: "In or about November, 1982, FREDERICK A. FIGGE [sic] authorized SAMMY G. DAILY to submit a false and fraudulent personal financial statement and loan application to CFSL for First United Partners IV on his behalf, *both knowing at the time that the statement omitted significant liabilities incurred by FIGGE at ISSB.*" I R., Doc. 1, at 23 (Count 14, ¶ 3(d)) (emphasis added). In addition, Count 1 alleges that Daily and Figge caused loan applications and other documents to be submitted to ISSB, "while knowing the same to have been obtained by way of false and fraudulent pretenses, representations and promises." *Id.* at 12 (Count 1, ¶ 14). Thus, the indictment does allege knowledge of falsity.[4]

The fact that the indictment contains all of the essential elements of the conspiracy offense, and all of the essential elements of the underlying substantive offenses, however, may not be enough, if the appearance of those elements does not give Daily and Figge adequate notice of the charges against them. As noted, an indictment must contain sufficient detail to put defendants on notice of the nature of the charges against them. *See Russell,* 369 U.S. at 760–69, 82 S.Ct. at 1045–49. In this connection, we have observed: "[S]ome substantial indication of the nature or character of any scheme or artifice to defraud, or to obtain money or property by means of false pretenses, representations or promises is requisite. And it is not sufficient in this regard to merely plead the statutory language." *United States v. Curtis,* 506 F.2d 985, 990 (10th Cir.1974) (citations omitted).

■ We hold that the indictment provides sufficient detail which should have put Daily and Figge on notice of the nature of the charges against them.[5] Here, the indictment "does more than merely repeat the words of the statute; it describes this particular conspiracy." *Mobile Materials, Inc.,* 871 F.2d at 909. " 'There is no magic to the words used ... to allege guilty knowledge.' What is demanded, however, is a competent and forthright attempt to notify the accused of the extent of his alleged culpability." *Nelson,* 406 F.2d at 1138 (quoting *Davis v. United States,* 347 F.2d 378, 379 (10th Cir.1965)). When we look to practical, rather than technical, considerations, *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988); *Robbins v. United States,* 476 F.2d 26, 30 (10th Cir. 1973), we must conclude that the indictment is sufficient.

2. Broadening the Indictment

■ Daily and Figge first argue here that the indictment was broadened by the district court's jury Instruction number 27 because it tracks the language of § 1001. Given our construction of § 1001 discussed above, we reject this argument. *See supra* note 3. Next, Daily and Figge contend that the indictment was broadened by jury Instruction number 23, which describes the

---

3. In fact, we have generally given a "unified" construction to § 1001. For example, we have expressly suggested that writings and other falsehoods are not distinguishable under the wording of the statute as amended. *United States v. Fitzgibbon,* 619 F.2d 874, 878 (10th Cir.1980). We have also treated materiality as an essential element of all offenses under § 1001 even though under the wording of the statute the materiality requirement does not appear to apply to false writings. *Gonzales v. United States,* 286 F.2d 118, 120–21 (10th Cir. 1960), *cert. denied,* 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961).

4. Daily and Figge do not argue that the indictment was insufficient with regard to § 1343. We note that the indictment sufficiently alleges conspiracy to commit that crime.

5. The indictment is 49 pages long. Count 30, including the parts of other counts expressly incorporated into it, takes up 42 of the pages. There is a great deal of detail in Count 30 (taking into account the incorporated matter) of the sort which would be given in a Bill of Particulars. Such factual detail is relevant to the notice question.

crime of conspiracy. Their argument appears to be that because the indictment is convoluted and confusing, it did not charge conspiracy at all, and by instructing the jury clearly on conspiracy, the trial court broadened the indictment.

Our decision in *Curtis, supra,* is instructive on this point. It was there alleged that the defendant had gained money by fraudulently claiming to operate a legitimate computer dating service. We ordered dismissal of the indictment. We held that the indictment was not specific enough to ensure that the defendant was convicted for the same illegal scheme on which the grand jury had intended to indict him. We said that "by the curious comminglement of references to the scheme with allegations of various means utilized to carry it out, the indictment is confusing as well as vague." 506 F.2d at 989. We added that "[i]nstructions cannot save a bad indictment, although in some cases they may ameliorate the prejudice." *Id.*

We acknowledge that the indictment here is lengthy and somewhat confusing. Taking into account other sections of the indictment expressly referenced, Count 30 is 42 pages long. Many facts are included, the relevance of which is far from clear. Nevertheless, we believe that the indictment does sufficiently allege a conspiracy. Unlike *Curtis,* the indictment here gives specific information as to the nature of the false statements alleged. Moreover, the first few paragraphs of Counts 1, 14, and 30 help explain the general nature of the conspiracy alleged. Instruction number 23, then, did not broaden the indictment.

Daily and Figge also contend that the district court broadened the indictment by the use of "or" in the jury instructions, where "and" had been used in the indictment. They argue that because the indictment was written entirely in the conjunctive, and because their request for a bill of particulars was denied, they should have been found guilty only if they were found guilty of conspiring to violate both §§ 1001 *and* 1343.

This argument is without merit, for at least two reasons. First, Daily and Figge were convicted of *conspiracy,* not making false statements or wire fraud. "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'" *Braverman v. United States,* 317 U.S. 49, 54, 63

S.Ct. 99, 102, 87 L.Ed. 23 (1942) (quoting *Frohwerk v. United States,* 249 U.S. 204, 210, 39 S.Ct. 249, 252, 63 L.Ed. 561 (1919)). Although Daily and Figge have not argued that Count 30 is duplicitous (*i.e.,* that it indicts them for more than one crime in one count), the *Braverman* analysis still applies. Daily and Figge were simply charged with violating the conspiracy statute in one or more ways. The sole crime at issue is conspiracy.

Second, it is generally accepted procedure to use "and" in an indictment where a statute uses the word "or." This assures that defendants are not convicted on information not considered by the grand jury:

> Frequently a statute will specify various ways in which a particular crime may be committed. It is enough to allege one of these ways without negativing the others. Or the pleading may allege commission of the offense by all the acts mentioned if it uses the conjunctive "and" where the statute uses the disjunctive "or." But if the indictment or information alleges the several acts in the disjunctive it fails to inform the defendant which of the acts he is charged with having committed, and it is insufficient.

1 C. Wright, *Federal Practice & Procedure* § 125, at 372–74 (1982) [hereinafter *Federal Practice*]. We have had occasion to endorse this procedure. *See United States v. Gunter,* 546 F.2d 861, 868–69 (10th Cir.1976), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977). The same logic holds in a case like this one where the conjunctive is used not only to describe two ways of violating a particular statute, but also to describe two underlying substantive offenses in a conspiracy charge. We therefore hold that the use of "or" in the jury instructions did not broaden the indictment.

## C. *Evidentiary Hearing*

■ Daily and Figge next argue that an evidentiary hearing should have been held to determine whether certain evidence should have been suppressed. We disagree.

Daily and Figge contend that the search warrant which enabled federal officials to search FUF's offices in Garden City, New York, II R., Doc. 54, Ex. F, was invalid. They assert that the warrant was based on an FDIC attorney's perjured affidavit. Thus, the verdict was allegedly obtained through the use of perjured testimony and

should be reversed. *United States v. Bagley*, 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–83, 87 L.Ed.2d 481 (1985); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).[6]

This argument was originally put forward by co-defendant Renda, II R., Doc. 54, and it is unclear from the record exactly when Daily and Figge joined the motion. During the trial, the motion was renewed by all defendants, V R., Doc. 116; XVII R. 3–30. The motion was denied. Doc. 120 (not designated on appeal). Post-conviction, Daily and Figge filed a "28 U.S.C. § 2255 Motion" to have their sentences vacated on the basis of new evidence regarding the search. VII R., Doc. 299; Doc. 298 (not designated on appeal). That motion was denied because the district court found that Daily and Figge lacked standing to object to the search. VII R., Doc. 325.

We need not determine whether the FDIC attorney committed perjury in order to obtain the warrant, or whether the warrant was otherwise improper. Daily and Figge are barred from raising their search-related objection in any event because they lacked a reasonable expectation of privacy in the offices of FUF. "Fourth Amend-ment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1968); *see United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978); *Mancusi v. DeForte*, 392 U.S. 364, 366, 88 S.Ct. 2120, 2122, 20 L.Ed.2d 1154 (1968). Daily and Figge bear the burden of showing that their fourth amendment rights have been violated. *See Rakas*, 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1; *United States v. Skowronski*, 827 F.2d 1414, 1417 (10th Cir.1987); *United States v. Hansen*, 652 F.2d 1374, 1381 (10th Cir.1981). They have failed to carry that burden.

It does not appear that either Daily or Figge were officers, employees, or shareholders of FUF. In fact, Daily and Figge have attempted to distance themselves from FUF in more than one instance.[7] Consequently, we hold that Daily and Figge had insufficient privacy interests to object to the allegedly illegal search of FUF.[8] They were accordingly not entitled to seek an evidentiary hearing for purposes

---

**6.** Daily and Figge cite Document 104 in their opening brief, at 17, which does not appear to be related to this argument. Document 104 deals with a motion to suppress due to an allegedly illegal seizure of materials located in Hawaii resulting from a "forthwith" subpoena. V R., Doc. 104. Because Daily and Figge have not prosecuted any contention of error here as to the Hawaii seizure, we do not address the matters raised in Document 104.

**7.** The defendants' brief states:
> Daily and Figge had *no* connection with the FUF conspiracy....
> ... *All* of the 29 Credit Union officials questioned [with whom FUF dealt] denied any knowledge of or association with Daily or Figge.
> ....
> ... The eight account executives responding to questions stated they had seen Daily on occasion at FUF; had *never* seen Figge, or had ever had a telephone conversation or done business with, or associated with, or told Daily or Figge of the "special" or "Joe Davis" deals. In fact, several account executives testified that they never told *anyone* outside of FUF about the "special deal" or "Joe Davis deal", confirming conclusively that the conspiracy ... *was an in-house closed loop First United Fund Conspiracy.*

Brief of Appellants at 27–28 (emphasis in original; citations omitted); *see id.* at 62 ("The sum-mation of the 39 witnesses ... was that they had never heard of Figge, had never corresponded with Figge, had never talked to Figge, and had no knowledge of Figge, and the same was testified to re Daily, except FUF employees testified that they had met or seen Daily on about two occasions in the FUF offices."). Further, Daily and Figge offer no argument or authority with regard to their privacy interests which would establish their right to object to the FUF search.

**8.** We have reviewed the cases cited by Daily and Figge in their Memorandum In Support of 28 U.S.C. § 2255 Motion, VII R., Doc. 299, expressly incorporated into their opening brief, which are said to establish their standing to object to the FUF search. However, with one exception which does not help Daily and Figge, *Eberhart v. United States*, 262 F.2d 421, 422 n. 1 (9th Cir.1958), these cases do not offer useful precedent for answering the question at issue here. *See generally Kaufman v. United States*, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969); *Hayes v. United States*, 419 F.2d 1364 (10th Cir.1969), *cert. denied*, 398 U.S. 941, 90 S.Ct. 1856, 26 L.Ed.2d 276 (1970); *Gaitan v. United States*, 317 F.2d 494 (10th Cir.1963); *Williams v. United States*, 307 F.2d 366 (9th Cir.1962); *United States v. Barillas*, 291 F.2d 743 (2d Cir.1961); *United States v. White*, 237 F.Supp. 644 (E.D.Va. 1964), *aff'd*, 342 F.2d 379 (4th Cir.), *cert. denied*, 382 U.S. 871, 86 S.Ct. 148, 15 L.Ed.2d 109 (1965).

of suppressing the evidence. *See United States v. Leary*, 846 F.2d 592, 595–96 (10th Cir.1988); *Skowronski*, 827 F.2d at 1417–18; *United States v. Wright*, 826 F.2d 938, 944 (10th Cir.1987); *United States v. Hansen*, 652 F.2d 1374, 1379–85 (10th Cir.1981).

### D. *Failure to Provide Exculpatory Evidence*

Daily and Figge argue that certain evidence was not provided to them by the government. We find this argument to be baseless. The government wrote a letter to James Wyrsch, attorney for co-defendant Mario Renda, and to Steven Dickson, attorney for Daily and Figge, which reads: "As previously indicated, October 5, 1987, is the date scheduled to provide to you certain matters in connection with the ... case. *As agreed, one set is being provided to Mr. Wyrsch, from which Mr. Dickson is to make copies for his clients.*" Government Ex. 1, at 1 (emphasis added). As evidenced by a receipt signed by Ronald Russo, another attorney for Renda, the requested evidence was received on October 6, 1987. Government Ex. 3, at 14. Daily and Figge have not challenged these documents in their briefs. Thus, the only evidence before us indicates that the materials sought by Daily and Figge were available to them since October 6, 1987, some thirteen days before trial.

### E. *Materiality Instructions: 18 U.S.C. §§ 1001 & 1343*

Daily and Figge next contend that the trial court did not properly instruct the jury on the issue of materiality under §§ 1001 and 1343. Specifically, as to § 1001, Daily and Figge contend that the trial court erred in not submitting the issue of materiality to the jury. The trial court expressly instructed the jury that materiality was an issue for determination by the court and that the facts at issue in Count 30 were material. As for § 1343, Daily and Figge again object to the trial court's alleged failure to submit the issue of materiality to the jury. Here, however, the trial court was allegedly silent altogether on the subject of materiality under § 1343. Daily and Figge contend that we should recognize that materiality is an essential (albeit implicit) element of the offense of wire fraud.

#### 1. Section 1001

■ As a preliminary matter, the government asserts that Daily and Figge failed to object to the trial court's instructions as to materiality under § 1001 and therefore cannot complain now. *See generally* Fed.R.Crim.P. 30 (providing that "[n]o party may assign as error any portion of the charge or omission therefrom unless that party objects thereto ... stating distinctly the matter to which that party objects and the grounds of the objection"). We disagree. However inartfully, Daily and Figge did sufficiently object to the materiality instructions.[9]

The trial court instructed the jury on the question of materiality under § 1001 as follows:

> The making of a false statement or use of a false report is not an offense unless made in order to influence agency reliance or agency action or agency omission or failure to act.
>
> And in this particular case, we disagree with the statement of the law that the statements made by the defendants to a bank were statements intended to influence agency decisions....

XXX5 R. 5753–54.

We have defined materiality as a natural tendency to influence, or the capability of influencing, the decision of the tribunal in making a determination required to be made. *See United States v. Irwin*, 654 F.2d at 671, 677 (10th Cir.), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982); *Gonzales*, 286 F.2d at 122 (citing *Weinstock v. United States*, 231 F.2d 699 (D.C.Cir.1956)). Counsel's objection, then, may be reasonably construed as a challenge to the trial court's determination of the materiality issue as a matter of law, with the attendant reduction of the government's burden of proof on this issue. Accordingly, we conclude that

---

9. In this regard, their counsel remarked:

The—we do not believe that the instructions in general adequately deal with 18 U.S.C. 1001. The Courts have defined a material false statement in regard to 18 U.S.C. 1001 to be statements calculated to induce agency, reliance or action....

The test for false statement is also whether the false statement is calculated to induce action or reliance by an agency of the U.S. In other words, it is one that could affect or influence the exercise of governmental functions or does it—stated another way, does it have a natural tendency to influence or is it capable of influencing a decision....

... The Government, of course, bears burden of proving that the statements were capable of influencing agency decisions. Therefore, it is up to the Government to prove that any alleged statements made by defendants Daily and Figge were, number one, false; number two, material; number three, made knowingly and willfully; and number four,

the falsity relates to a "material" fact. The issue of materiality, however, is not submitted to you for your decision but is a matter to be determined by the court. You are instructed that the alleged facts, charged in Count 30 of the Indictment as having been falsified in violation of 18 U.S.C. § 1001, would be material.

VI R., Doc. 146, at Instruction No. 30. Under our prior cases, such an instruction would surely be deemed error. *See Irwin*, 654 F.2d at 677 n. 8; *United States v. Radetsky*, 535 F.2d 556, 571 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Gonzales v. United States*, 286 F.2d 118, 122 (10th Cir.), *cert. denied*, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961). We have consistently held that materiality is an essential element of an offense under § 1001 and, like other essential elements, must ordinarily be submitted on proper instructions for determination by the jury. *See Radetsky*, 535 F.2d at 571; *accord United States v. Valdez*, 594 F.2d 725, 729 (9th Cir.1979).

To be sure, our view as to the appropriate decision-maker of materiality under § 1001 is not in accord with that of most federal appellate courts that have considered the question.[10] And, in the context of other false statement statutes, we have held that materiality is a question of law for the court. *See United States v. Vap*, 852 F.2d 1249, 1253–54 (10th Cir.1988) (18 U.S.C. § 1623, perjury before a grand jury); *United States v. Masters*, 484 F.2d 1251, 1254 (10th Cir.1973) (18 U.S.C. § 1621, general perjury statute); *United States v. Strand*, 617 F.2d 571, 573–74 (10th Cir.) (26 U.S.C. § 7206(1), falsification of tax returns), *cert. denied*, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). However, until now, we have not been persuaded that our position on § 1001 materi-

ality was wrong. *See Irwin*, 654 F.2d at 677 n. 8.

Upon consideration of the Supreme Court's decision in *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988), we conclude that materiality under § 1001 is a question of law for the court and, accordingly, the trial court's refusal to submit the materiality issue under § 1001 to the jury was not error. The court now disavows our prior holdings to the contrary.[11] We are mindful that our panel is bound by prior decisions of this court, *see, e.g., United States v. Berryhill*, 880 F.2d 275, 277–78 (10th Cir.1989), but we are authorized by all the active judges of this court to state that the court endorses this overruling of our prior cases on the materiality issue under § 1001 in light of the Supreme Court's guidance in *Kungys*.

In *Kungys*, the Court examined the concept of materiality under 8 U.S.C. § 1451(a), which provides in part for the denaturalization of citizens whose citizenship orders and certificates were "illegally procured or were procured by concealment of a material fact." Among the issues of particular concern to the Court in *Kungys* was whether the materiality question under § 1451(a) was one of law or fact. 485 U.S. at 766 & n. 4, 108 S.Ct. at 1544 & n. 4. In deciding this issue, the Court looked to the practice under other false statement statutes proscribing misrepresentations to public officials and concluded that materiality was a question of law for the court. The Court relied on dictum in *Sinclair v. United States*, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929), where the Court had observed that "the question of materiality of what is falsely sworn, where an element in the crime of perjury, is one for the court." 279 U.S. at 298, 49 S.Ct. at 273.

---

Daily and Figge adequately objected to the materiality instructions at trial and may assert their claim of error here.

**10.** *See, e.g., Weinstock v. United States*, 231 F.2d 699, 703 (D.C.Cir.1956); *United States v. Bernard*, 384 F.2d 915, 916 (2d Cir.1967); *United States v. Greber*, 760 F.2d 68, 73 (3d Cir.), *cert. denied*, 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985); *Nilson Van & Storage Co. v. Marsh*, 755 F.2d 362, 367 (4th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985); *United States v. Hausmann*, 711 F.2d 615, 616–17 (5th Cir.1983); *United States v. Abadi*, 706 F.2d 178, 180 (6th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983); *United*

*States v. Bullock*, 857 F.2d 367, 370–71 (7th Cir.1988); *United States v. Adler*, 623 F.2d 1287, 1292 (8th Cir.1980); *United States v. Lopez*, 728 F.2d 1359, 1362 n. 4 (11th Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984).

**11.** Our principal cases on the § 1001 materiality issue are: *United States v. Irwin*, 654 F.2d 671 (10th Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982); *United States v. Radetsky*, 535 F.2d 556 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); and *Gonzales v. United States*, 286 F.2d 118 (10th Cir.), *cert. denied*, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961).

Further, recognizing it as the "most prominent" of the false statement statutes, the Court in *Kungys* specifically focused on the practice with regard to materiality under § 1001. *Id.* at 769–70, 108 S.Ct. at 1545–46. In this connection, the Court observed:

> As the Sixth Circuit has said in a case involving 18 U.S.C. § 1001:
>
> > "[A]lthough the materiality of a statement rests upon a factual evidentiary showing, the ultimate finding of materiality turns on an interpretation of substantive law. Since it is the court's responsibility to interpret the substantive law, we believe [it is proper to treat] the issue of materiality as a legal question." *United States v. Abadi,* 706 F.2d 178, 180, cert. denied, 464 U.S. 821 [104 S.Ct. 86, 78 L.Ed.2d 95] (1983).

485 U.S. at 772, 108 S.Ct. at 1547. The Court in *Kungys* thus concluded that materiality under § 1451(a) was a question of law.

Focusing on the analysis in *Kungys,* we feel constrained to reach the same result as to materiality under § 1001. The Court looked to the Sixth Circuit's decision in *Abadi* as exemplifying the decision-making practice with regard to materiality under § 1001.[12] Further, guided by the language of *Sinclair,* the Court accepted the *Abadi* practice as indicative of the general decision-making practice under false statement statutes and adopted it for purposes of § 1451(a). Thus, while the Court's statement in *Kungys,* quoted above, and its analysis there are dicta as to the precise issue under § 1001 before us, we feel constrained to adopt the principle that materiality under 18 U.S.C. § 1001 is a question of law for the court to determine with an instruction to the jury on the court's conclusion as to materiality in the case being tried.[13] Here, we are satisfied that the

trial judge properly instructed the jury that the alleged facts, charged in Count 30 as having been falsified in violation of § 1001, would be material.[14]

The argument advanced by Daily and Figge to the contrary is not persuasive. They contend that the holding of our cases providing for jury decision-making on the materiality issue is dictated by the Supreme Court's due process jurisprudence and, in particular, the Court's decision in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In *Winship,* the Court held that the due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364, 90 S.Ct. at 1072. Under *Winship* and its progeny, an accused is entitled to a jury determination of each essential factual element of the charged offense; action by the trial court which amounts to a directed verdict on such an element of the offense is unconstitutional. *E.g., United States v. Bass,* 784 F.2d 1282, 1284–85 (5th Cir.1986).

Because we have held that materiality is an essential element of the § 1001 offense, Daily and Figge reason that *Winship* mandates that we adhere to our prior cases holding that materiality is an issue for the jury. *See United States v. Taylor,* 693 F.Supp. 828, 846–47 (N.D.Cal.1988). We disagree. First, in *United States v. Larranaga,* 787 F.2d 489 (10th Cir.1986), we rejected a similar argument in the context of a perjury prosecution under 18 U.S.C. § 1623(a), holding that the trial court's determination of materiality (an essential element of the offense) did not result in an "infringement of the right to trial by jury." 787 F.2d at 494; *see Sands v. Cunningham,* 617 F.Supp. 1551, 1554–55 (D.N.H. 1985) (holding in habeas corpus action that state court's ruling on materiality as a

---

**12.** The Sixth Circuit in *Abadi* expressly noted the disagreement among the circuits as to whether materiality under § 1001 is a question of law or fact and, in particular, noted the position of our prior cases on this issue. 706 F.2d at 180.

**13.** *See Marvel v. United States,* 548 F.2d 295, 300 (10th Cir.) (finding the reasoning of carefully considered dictum of the Supreme Court "persuasive"), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2924, 53 L.Ed.2d 1062 (1977).

**14.** We agree with the view that such a legal determination whether representations or statements are material or not is one as to which there is, "in theory at least, no continuum of assurance and dubiosity as to the establishment of a proposition of law similar to the varying degrees of certainty and uncertainty which may be ascribed to propositions of fact." *United States v. Armilio,* 705 F.2d 939, 941 (8th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983) (quoting *United States v. Watson,* 623 F.2d 1198, 1202 (7th Cir.1980)); *see also United States v. Larranaga,* 787 F.2d 489, 496 (10th Cir.1986).

question of law in a perjury prosecution did not violate petitioner's sixth and seventh amendment rights).

Second, as noted by the District of Columbia Circuit in the context of § 1001, nothing in the *Winship* line of cases "t[eaches] that materiality is anything other than a question of law for the court." *United States v. Paxson*, 861 F.2d 730, 732 (D.C.Cir.1988). Lastly, looking to the language of *Sinclair*, a sound argument may be made that materiality is a "historical exception" to the general due process mandate of *Winship* that each essential element of the crime charged must be submitted to the jury. *See United States v. Johnson*, 718 F.2d 1317, 1323–24 (5th Cir. 1983) (en banc).

Accordingly, we conclude that the trial court did not err in treating the question of materiality under § 1001 as one of law and refusing to submit it to the jury.

**2. Section 1343**

■ We next turn to Daily and Figge's related argument as to § 1343. They contend again that materiality is an essential element of the offense under § 1343 (wire fraud) and, accordingly, the trial court erred in failing to submit the question to the jury. We also find this contention to be untenable. Even if materiality were an essential element of the § 1343 offense, our analysis of *Kungys* in the context of § 1001 makes clear that the trial court did not err in failing to submit the materiality question to the jury as a separate essential issue. Moreover, under § 1343 materiality is not a separate essential element of wire fraud.

There are two essential elements of the wire fraud offense under § 1343: (1) a scheme to defraud; and (2) the use of interstate wire communications in furtherance of the scheme to defraud. *United States v. O'Malley*, 535 F.2d 589, 592 (10th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 383, 50 L.Ed.2d 326 (1976); *see Brandon v. United States*, 382 F.2d 607, 610 (10th Cir.1967) (citing *Huff v. United States*, 301 F.2d 760 (5th Cir.), *cert. denied*, 371 U.S. 922, 83

S.Ct. 289, 9 L.Ed.2d 230 (1962)); *cf.* 2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 47.05 (1977) (omitting materiality from recitation of the essential elements of the analogous offense of mail fraud) [hereinafter *Federal Jury Practice* ]. To be sure, there is a materiality aspect to the determination whether the acts of an accused give rise to a scheme to defraud. More specifically, there is a materiality aspect to the determination whether the alleged representations of the accused are fraudulent. *See* 2 S. Saltzburg & H. Perlman, *Federal Criminal Jury Instructions* § 24.07 note (1990) (discussing role of materiality in offense of mail fraud); 2 *Federal Jury Practice, supra,* § 47.04 (noting that a "false or fraudulent representation" under the mail fraud statute involves, among other things, "the concealment of material facts").

This materiality aspect is appropriately submitted to the jury as one component of the larger factual question as to the existence of fraud and a scheme to defraud. *Cf.* Restatement (Second) of Torts § 538 comment e (1977) (noting that materiality as a component of the tort of fraud is a question for the jury). We feel this result is not inconsistent with our holding as to the proper decision-maker of materiality under § 1001 because, on this level of essential elements of the charged offense, the ultimate determination does not "turn[ ] on an interpretation of substantive law" (raising a question of law for the court), *Abadi*, 706 F.2d at 180, but is predominantly a question of fact as to the existence of fraud and a scheme to defraud. The trial court properly submitted this narrow, subordinate aspect of materiality to the jury in its instructions as to wire fraud. *See* VI R., Doc. 146, at Instruction No. 13.[15] Accordingly, we find no error in the trial court's treatment of the question of materiality under § 1343.

**F. Single Versus Multiple Conspiracy**

Daily and Figge argue that their convictions cannot stand because there was a fatal variance between the indictment,

---

**15.** In pertinent part, the trial court's instruction reads:

A statement or representation is "false" or "fraudulent" within the meaning of this statute if it is related to a material fact and is known to be untrue or is made or caused to be made with intent to defraud....

A statement or representation may also be "false" or "fraudulent" when it constitutes a half truth, or effectively conceals a material fact, with intent to defraud. A "material fact" is a fact that would be important to a reasonable person in deciding whether to engage or not engage in a particular transaction.

VI R., Doc. 146, at Instruction No. 13.

which alleged a single, multi-faceted conspiracy, and the proof at trial, which established the existence of multiple conspiracies. *See generally Kotteakos v. United States,* 328 U.S. 750, 758, 765–66, 66 S.Ct. 1239, 1244, 1248–49, 90 L.Ed. 1557 (1946); *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). They also say that the trial court erred in declining to give their multiple-conspiracy instruction. We hold these arguments are without merit.

### 1. Variance

■ At the outset, it is important to clarify the nature of the inquiry. The basic issue is whether, viewed in the light most favorable to the government, there was sufficient evidence upon which a reasonable jury could find the existence of a single conspiracy beyond a reasonable doubt. *See United States v. Dickey,* 736 F.2d 571, 581–82 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *United States v. Behrens,* 689 F.2d 154, 160 (10th Cir.), *cert. denied,* 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982). That the record reveals some scintilla of evidence of a variance (that is, evidence of multiple conspiracies) is immaterial.

■ As to the existence of a single conspiracy, the focal point of the analysis is whether the alleged co-conspirators were united in a common unlawful goal or purpose. *See United States v. Nunez,* 877 F.2d 1470, 1473 (10th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989); *United States v. Pilling,* 721 F.2d 286, 292–93 (10th Cir.1983). Of principal concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence. *See Dickey,* 736 F.2d at 582; *United States v. Heath,* 580 F.2d 1011, 1022 (10th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979); *cf. United States v. McMurray,* 680 F.2d 695, 704 (10th Cir.1981) (en banc) (Doyle, J., dissenting) (noting that interdependence "serves as a basis for imputing knowledge of the larger plan to peripheral participants and ties all of them together in one scheme"). In other words, of principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous tʋ the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole. *United States v. Richerson,* 833 F.2d 1147, 1154 (5th Cir.1987); *see United States v. Russo,* 527 F.2d 1051, 1059 (10th Cir.1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 831 (1976); *United States v. Kenny,* 462 F.2d 1205, 1216–17 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).

■ Here there was evidence tending to show this essential structure: the alleged co-conspirators were united in a common unlawful goal or purpose. Specifically, they sought to profit through diverse fraudulent means from the process of inducing financial institutions to make loans which were ostensibly designed to fund limited partnerships. And, their activities clearly evidenced an interdependence. In order for the loans to issue to the limited partners, it was imperative that there be money in the lending institutions. Through FUF and its employees, alleged co-conspirator Renda ensured that money was available for loans by inducing credit unions with fraudulent representations as to the interest-rate return to purchase CDs.

Also, there was proof that in order for loans to issue to the limited partners, there had to be financial institutions willing to make the loans. Through negotiations with small, money-starved lending institutions, alleged co-conspirator Franklin Winkler was able to ensure that there were in fact such willing institutions, promising them substantial deposits equal to double the amount that they were required to allocate for loans to the limited partners. Lastly, in order for loans to issue to limited partners, there had to in fact be limited partners, and they had to be, at least on paper, loan-eligible. As discussed more fully below in analyzing the sufficiency of the evidence challenge, Daily and Figge were actively involved in inducing persons to become limited partners, in part, through fraudulent representations as to the extent of their liability on loans. Further, to ensure that the recruited limited partners were loan-eligible, Daily and Figge completed or altered loan materials such that they evidenced material falsehoods. Thus there was evidence that the activities of the co-conspirators here, then, clearly exhibited interdependence.

Moreover, there was evidence which tended to show that the co-conspirators stood to profit from the venture, that is, the process of fraudulently securing loans.

Daily, Figge, and Winkler were each general partners in at least some of the limited partnerships, and in a position to clandestinely and unlawfully siphon off loan proceeds for their personal benefit. *See* XXII R. 166–68; XXIX R. 3845–55. Also, it could be inferred that the fraudulent loan scheme provided Renda (through FUF) with an opportunity to receive a stream of commissions for his brokerage services. *See* Government Ex. 1257, at 3 (observing as to the payment by the limited partnerships of "points," or a percentage of loan proceeds to FUF, "part of it is a fee that First United Fund charges so they stay in business"). We are thus satisfied there was sufficient evidence upon which a reasonable jury could find a single conspiracy beyond a reasonable doubt.

Daily and Figge argue vigorously that the evidence adduced at trial established the existence of multiple conspiracies, as in *Kotteakos.* However, their contentions on this point are generally baseless. Most troublesome, at least at first blush, is their contention that the money brokerage scheme involving Renda, FUF, and its employees constituted a separate conspiracy. A number of witnesses involved in the brokerage operation did testify that they did not know Daily well, and did not know Figge at all. XVIII R. 394–96, 635, 644; XIX R. 737–38, 871–73, 993–99; XX R. 1146–49. Further, witnesses associated with FUF testified that Daily did not instruct them to falsify interest rates, and that in fact he had no input as to the brokerage operation. XVIII R. 412, 581, 586, 644–45; XIX R. 908, 999, 1008–09; XX R. 1152–54; XXIII R. 1964–65. Certain witnesses associated with the credit unions also testified that they had no contact with Daily or Figge. XVIII R. 458, 470, 481, 490, 502, 531, 555; XIX R. 699, 772–73, 928–29, 936–37, 947–48; XX R. 1059, 1070, 1077–78, 1088; XXI R. 1581–82, 1590–91, 1598–99, 1631. Also, some evidence suggests that there was a certain distance between Renda's brokerage activities and the investment scheme. XIX R. 728; XX R. 1230, 1290–95, 1324; XXI R. 1378. However, we are still persuaded that there was sufficient evidence upon which a reasonable jury could find a single conspiracy beyond a reasonable doubt.

■ The fact that a number of separate transactions may have been involved in the case does not establish the existence of a number of separate conspiracies. *See Par-*

*nell,* 581 F.2d at 1382; *Heath,* 580 F.2d at 1022. Often in a complex conspiracy like this one, there is a division of labor among co-conspirators. Each conspirator need not know the identity of all the other members of the conspiracy or be privy to all the means used to effectuate each aspect of the conspiracy. *See, e.g., United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Ashley,* 555 F.2d 462, 467–68 (5th Cir.), *cert. denied,* 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977). Generally, it is sufficient for purposes of a single-conspiracy finding that a conspirator knowingly participated with a core conspirator in achieving a common objective with knowledge of the larger venture. *See United States v. Martinez,* 877 F.2d 1480, 1481–82 (10th Cir. 1989); *Richerson,* 833 F.2d at 1154.

A core conspirator here was Franklin Winkler. There is considerable evidence to support the view that Franklin Winkler was well-versed in each phase of the instant conspiracy, including the money brokerage operation, and knowingly participated therein. *See* XII R. 783–804, 818, 850; XXIII R. 1989–91; Government Ex. 1253, at 2–7, 34–35; Government Ex. 1257, at 1–3. The jury could find that Daily and Figge knowingly conspired with Franklin Winkler in inducing target financial institutions to loan money to the limited partners. *See* XXIII R. 1666–68; XXV R. 2709–10; Government Ex. 1253, at 5–6, 34–35. And there can be no doubt that in doing so, Daily and Figge had some knowledge of the larger venture. At a recruitment meeting for prospective limited partners, in the presence of Winkler and Figge, Daily stated:

> What I'd like to do first is I would like to go back and recap exactly how we put one of these limited partnerships together so you'll all know.... FRANKLIN has an acquaintance named MARIO RENDA who owns the largest purchaser of CD's in the United States. That entity that purchases the CD's is First United Fund .... I say deposit and I'll use that word, it really means they purchase CD's from banks and savings and loans. They can only put the money where their money's protected by FDIC. So MARIO and FRANKLIN *reached an agreement for us.* If we can get a bank to cooperate with us. MARIO will go to his entity to find money for the bank. The basic agreement we make with the bank, and

this has some slight iterations, but this is the basic agreement. We say to a bank we need, for example, one million dollars for a limited partnership and we'll bring you somewhere between 10 and 24 prime individuals for signature loans and it will be secured by their interest in the limited partnership (unintelligible). And if you will agree to do that, then we will agree to deposit in your bank $2,000,000.

Government Ex. 1257, at 1–3 (emphasis added). We therefore conclude that Daily and Figge's variance challenge must fail.

### 2. Multiple–Conspiracy Instruction

■ Daily and Figge also argue that the trial court committed prejudicial error in declining to submit their multiple-conspiracy instruction to the jury. Generally, this instruction cautioned the jury that it was only permitted to find the defendants guilty of the conspiracy charged in the indictment, and that proof of several, separate conspiracies did not constitute proof of the single, overarching conspiracy charged in the indictment, unless the separate conspiracies were established to be part of the single conspiracy. *See* VI R., Doc. 140, at Proposed Instruction No. 52. Although the specificity of Daily and Figge's multiple-conspiracy instruction is perhaps desirable under certain circumstances, we cannot say that, in refusing to give it here, the trial court committed prejudicial error.

The trial court carefully instructed the jury that the government had the burden of proving each defendant guilty beyond a reasonable doubt, and that it had to consider the evidence separately as to each defendant. VI R., Doc. 146, at Instruction Nos. 8, 9, and 11. Further, along the lines of Daily and Figge's proposed instruction, the trial court instructed that "the defendant cannot be tried or convicted of any offense not charged in the Indictment." *Id.* at Instruction No. 48.

Instruction 23 instructed on the terms of the conspiracy statute; that a conspiracy is a combination "to accomplish some unlawful purpose"; and that the evidence "must show beyond a reasonable doubt ... that the members in some way or manner came to *a mutual understanding to try to accomplish a common and unlawful plan*"; and that the common and unlawful plans were a plan to violate the wire fraud statute (18 U.S.C. § 1343), and a plan to violate the false statement statute (18 U.S.C. § 1001). *Id.* at Instruction No. 23 (emphasis added). Instruction 24 instructed that if the jurors found beyond a reasonable doubt that the conspiracy did exist, "you should next determine whether or not the accused willfully became a member of the conspiracy." *Id.* at Instruction No. 24. Further, Instruction 25 charged that if it appeared beyond a reasonable doubt "*that the conspiracy alleged in the Indictment was willfully formed, and that the defendant willfully became a member of the conspiracy*" then they should determine whether one or more overt acts were committed. *Id.* at Instruction No. 25 (emphasis added).

Instruction 26 summed up by saying if it was found beyond a reasonable doubt that "the conspiracy alleged in the Indictment was willfully formed"; that the defendant willfully became a member of the conspiracy; and one or more conspirators knowingly committed one or more overt acts, then the jury may find the defendant guilty of conspiracy in violation of 18 U.S.C. § 371. *Id.* at Instruction No. 26.

In evaluating a remarkably similar set of instructions, we found no prejudicial error in the trial court's failure to give an express multiple-conspiracy instruction. *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979). As in *Watson* we conclude that, viewed as a whole, the trial court's instructions "adequately covered the question [of multiple conspiracies]." *Id.* In particular, the trial court put the jury on sufficient notice that in order to convict Daily and Figge under Count 30 it had to find beyond a reasonable doubt that the particular conspiracy charged therein existed and that each defendant was a member of it. In sum, on this multiple-conspiracy issue we find no merit in Daily and Figge's claims of error.

### G. *Character Instruction*

Daily and Figge further contend that the trial court committed prejudicial error in failing to submit their requested instruction as to character evidence to the jury. Defendants maintain that this was one theory of their defenses; that they both "had many, many years of personal reputation to rely on, Daily having served honorably and with distinction in the military for 24 years.... and Figge having spent nearly a life-time doing community service work of various types...." Brief of Appellants at 52 (record citations omitted). Giving full consideration to the instructions as a

whole, as we must, we agree with the defendants.

Defendants not infrequently present evidence of good character, with the aim of encouraging the jury to draw the inference that it is unlikely that they committed the charged offense, and request an instruction from the court on the subject. *See Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948); *Oertle v. United States,* 370 F.2d 719, 726 (10th Cir.1966), *cert. denied,* 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329 (1967); 1 C. Torcia, *Wharton's Criminal Evidence* § 177 (1985) [hereinafter *Criminal Evidence*]. In this regard, Daily and Figge's proposed instruction is typical:

> Where a defendant has offered evidence of good general reputation for truth and veracity, or honesty and integrity, or as a law-abiding citizen, the jury should consider such evidence along with all the other evidence in the case.
>
> Evidence that a defendant's reputation for truth and veracity, or honesty and integrity, or as a law-abiding citizen has not been discussed; or that those traits of the defendant's character have not been questioned, may be sufficient to warrant an inference of good reputation as to those traits of character.
>
> Evidence of a defendant's reputation, inconsistent with those traits of character ordinarily involved in the commission of the crime charged may give rise to a reasonable doubt, since the jury may think it improbable that a person of good character in respect of those traits would commit such a crime.
>
> The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

VI R., Doc. 140, at Proposed Instruction No. 33; *see United States v. McMurray,* 656 F.2d 540, 551 (10th Cir.1980), *reh'g granted on other grounds,* 680 F.2d 695 (1981); 1 *Federal Jury Practice, supra,* § 15.25 (endorsing the use of essentially identical instruction). The trial court, however, failed to give this instruction as to character evidence, and the instructions that it submitted to the jury cannot be reasonably construed as addressing the issue.

In criminal cases, defendants are ordinarily entitled to a character instruction like the one above if two conditions are satisfied. First, defendants must in fact present evidence as to their good character, either through their own testimony or that of character witnesses. That is, they must affirmatively make their character an issue in the case. *See United States v. Thomas,* 676 F.2d 531, 536–37 (11th Cir.1982); 1 *Criminal Evidence, supra,* § 169. Second, their character evidence must concern traits that are relevant to the charged offense. *See Hawley v. United States,* 133 F.2d 966, 972–73 (10th Cir.1943); 1 *Criminal Evidence, supra,* § 169. The trait of being law-abiding is generally viewed as relevant to any criminal offense. *See McCormick On Evidence* § 191, at 567 (E. Cleary 3d ed. 1984). Where such evidence is admitted, the defendant is entitled to an instruction in conformity with the purposes for which it is admissible. *See Hawley,* 133 F.2d at 973; 2 *Federal Practice, supra,* § 759.

On these facts, it is clear that the first condition is satisfied. Daily testified at some length regarding his distinguished 24–year career in the Air Force. During that time, he received several commendations, including a Bronze Star for valor. XII R. 12–13. Significantly, Daily noted that for many of his years in the Air Force he possessed a top secret clearance. *Id.* at 20. In order to get this clearance, Daily had to be investigated by law enforcement officials to ensure that he was "a reputable, upstanding man." *Id.* at 21. And, in order to keep his security clearance, Daily had to undergo periodic re-investigations of his background. The last re-investigation occurred approximately one year before his retirement in October 1976. Daily never lost his security clearance as a result of these re-investigations. *Id.* at 21–22.

Through his own testimony, Figge also presented character evidence (thereby satisfying the first condition). Figge testified that during several years of employment at Northrop, he worked on military projects. He had "secret" clearances during those times, which were updated. XXXIV R. 5406–07. Figge alluded to his extensive involvement in activities in his community. Specifically, he testified that he was active in his church, singing in the choir and serving for four years on the Board of Trust-

ees.[16] XXXIV R. 5408–09. Figge noted that he also served as Budget Chairman of his homeowner's association. *Id.* at 5409. Further, Figge testified that he was active in the local chapter of the Junior Chamber of Commerce, an international community service organization, and eventually rose to the second highest post in the entire organization. *Id.* at 5410–11.

As for satisfaction of the second condition (*i.e.*, relevancy to the charged offense), we also find Daily and Figge's testimony to be sufficient. The crime at issue of course is conspiracy to violate 18 U.S.C. §§ 1001 and 1343. At a minimum, Daily and Figge's testimony touches on their character as to the trait of being law-abiding, which is relevant to virtually all offenses. Also, Daily and Figge's success in acquiring and retaining their security clearances in the face of re-investigations may be reasonably viewed as bearing on the trait of honesty, which is clearly relevant to the instant prosecution based on an alleged conspiracy by defendants to engage in fraudulent conduct. *See Hawley,* 133 F.2d at 972–73. In the same vein, Figge's success in rising to the top of an international community service organization may be reasonably viewed as implicating the traits of honesty and integrity, also of concern in the instant prosecution. *Id.* We note, moreover, that there was testimony of other witnesses that not only tended to put the character of Daily and Figge at issue but also satisfied the second condition, addressing their character relative to the traits of being law-abiding and honest. *See* XV R. 21–22 (discussing Daily); XXXIV R. 5369–70 (discussing Figge).

Accordingly, Daily and Figge were entitled to an instruction as to character evidence and, in failing to give such an instruction, the trial court committed error. Under the circumstances presented here, moreover, we conclude that this error was prejudicial. This was a complex case—

resting in large part on evidence of alleged fraudulent activity by Daily and Figge—in which the jury evidently found its decision-making process to be difficult. The jury deliberated on the charges of the indictment for three days, pausing only for the Christmas holiday, before finding Daily and Figge guilty of the single charge of conspiracy.[17] It cannot be deemed nonprejudicial in a tough case like this one that the jury was not instructed that it might properly consider the evidence of good character, which may (when viewed in the light of other evidence) generate a reasonable doubt.

We must agree, therefore, that Daily and Figge's convictions cannot stand and the case must be remanded for a new trial on Count 30.

### H. *Sufficiency of the Evidence*

■ Daily and Figge also argue that there was insufficient evidence to convict them of conspiring to violate 18 U.S.C. §§ 1001 and 1343. Although we are reversing their convictions for retrial on other grounds, we must still reach this issue. To retry the defendants after the prosecution's evidence at their first trial was insufficient would violate the Constitution's double jeopardy proscription. U.S. Const. amend. V; *see Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2151, 57 L.Ed.2d 1 (1978); *see also United States v. Doran,* 882 F.2d 1511, 1526 (10th Cir.1989); *United States v. Morris,* 612 F.2d 483, 491–92 (10th Cir.1979).

The standard of proof for determining whether there was sufficient evidence to support the jury's guilty verdict as to the conspiracy charge at issue is basically "the same standard as that used to review the jury's finding of a single conspiracy—the entire record must be viewed in the light most favorable to the government to determine whether all the evidence and reason-

---

**16.** In passing, we note that our decision in *Burns v. United States,* 286 F.2d 152 (10th Cir. 1961), upholding as proper a trial court's exclusion of evidence of defendant's attitudes and habits with respect to prayer, is distinguishable for at least two reasons. First, unlike *Burns,* Figge's religiousness per se is not at issue here, but rather his voluntary participation in organizations (including religious organizations) that are commonly understood as having eleemosynary or other socially beneficial objectives. Second, evidence of Figge's church-related activities was not introduced, as in *Burns,* to dispute immaterial factual averments of the indictment

but, rather, specifically as evidence bearing on Figge's allegedly good character.

**17.** *See Dallago v. United States,* 427 F.2d. 546, 559 (D.C.Cir.1969) (where the jury deliberated for five days, noting that "if the evidence of guilt was overwhelming the jury would have succumbed much sooner"); *Osborne v. United States,* 351 F.2d 111, 118 (8th Cir.1965) (noting that, among other things, the fact that jury deliberated for sixteen hours, over the course of two full working days, "lends credence to the view that the case was a close and difficult one").

able inferences to be drawn therefrom is sufficient enough to show guilt beyond a reasonable doubt." *Dickey,* 736 F.2d at 583; *see United States v. Fox,* 902 F.2d 1508, 1513–14 (10th Cir.), *cert. denied,* ——

18. With respect to Daily, there was ample evidence to support his conviction on the conspiracy count. Daily's bookkeeper testified that prior to the commencement date of the charged scheme, Daily had cash flow problems and stated that he had a plan involving limited partnerships which would take over his properties and cover his cash flows. XXIX R. 3833–36; *see also* Government Ex. 711. There was evidence presented that tends to show that Daily and Franklin Winkler arranged to have "credit worthy and financially stable" borrowers (that is, limited partners in the real estate entities formed by Daily and Winkler) take out loans from federally-insured lending institutions.

Daily was integrally involved with recruiting limited partner investors for the real estate ventures, and did the lion's share of the talking at recruiting meetings with account executives from FUF, real estate agents from his own company (Sam Daily Realty), and others. XXII R. 1827; *see also* Government Ex. 1253; Government Ex. 1257. Witnesses testified that Daily told them that the profits would be high, or that this was the "deal of a lifetime," X R. 11; *see* XXII R. 1833–34; XXV R. 2585–87, 2592, and the risk was very low. X R. 11, 17; XXII R. 1835–36, 1842; XXV R. 2587–2788, 2822–23; *see also* Government Ex. 1253, at 2, 84.

Furthermore, a witness testified that Daily told prospective limited partners to ignore cautionary statements in the Private Placement Memorandum (PPM), an investors' disclosure document. XXII R. 1944–45. Indeed, evidence suggests that some of these partners never even received PPMs. XXV R. 2835; XXVI R. 3136–37. Evidence also suggests that Daily knew the real estate market in Hawaii was sluggish, XIII R. 270–73; XXXIV R. 5556–57, but that he did not disclose this information. Government Ex. 1253, at 87.

Witnesses testified that they did not believe they would be personally liable for the loans, XXII R. 1836; XXV R. 2685–86; *see* Government Ex. 1253, at 84; Government Ex. 1257, at 47, and that in any case Daily said that the banks would go after the "deep pockets" first. XXIV R. 2407; *see* XXV R. 2685. Daily represented that he would personally guarantee a large amount of the loans. XXII R. 1835; Government Ex. 1257, at 50; *see also* Government Ex. 379, at 2. The limited partners were also told that they would not be required to contribute any more money later. XXII R. 1838; Government Ex. 1257, at 47, 53–54.

Daily and Winkler told investors that qualifying for the loans would be easy, and (contrary to what Winkler had told the lending institutions) deposits were dependent on approval of the loans. XXII R. 1833, 1838–39; XXIII R. 1989–91, 2033; XXV R. 2709–10; Government Ex. 1253, at 35; Government Ex. 1257, at 1–4;

U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990). We are convinced that sufficient evidence was presented at trial to support the jury's verdicts of guilty as to Daily[18] and Figge.[19]

*see also* XXIV R. 2406–08. Witnesses said that Daily requested that they fill out a draft application, and sign an additional blank copy. X R. 13; XXII R. 1837; XXV R. 2826–27. Examiners found that some of these loan applications had been falsified. XXI R. 1451–52, 1457.

In some cases, investors were told to falsify information. XXII R. 1912–13 (told by Daily or Figge); XXIII R. 1991 (told by Winkler); XXV R. 2709–10 (told by Daily); XXVII R. 3183–85 (told by Daily). However, Daily personally increased assets for one investor on an application in order to get her qualified for a loan. XI R. 69–70. Further, witnesses stated that they gave or sent applications to Daily, X R. 19–20, 29; XXII R. 1837; XXIV R. 2414, and that information was later changed on the applications, X R. 19–22, or applications were submitted to other banks without their prior knowledge. X R. 14–15, 27–28; XXV R. 2719–22.

In one case a witness testified that he had signed papers, at Daily's behest, which he believed merely showed that he might be interested in investing. The witness later found that he had in fact signed loan papers. X R. 23–27. In another case, a witness said he saw his "signature" on forms, in what he recognized to be Daily's handwriting. XI R. 3–8. There was also evidence that appraisals of property had been falsified, and that these "appraisals" were given at Daily's direction. XXI R. 1480–85; XXXII R. 4676–77, 4704–19; *see also* XXVIII R. 3590–92.

Evidence suggested that property was not transferred into partnerships as promised. XXX R. 4311–12. However, proceeds of the loans were deposited into partnership accounts, XXII R. 1803, which only Daily, Winkler, and Figge could touch. XXI R. 1459; XXII R. 1665–67, 1844–45. Checks were written to Daily (both personally and to his real estate company) out of those accounts. XXIX R. 3845–55. There was evidence that Daily kept control of properties in one of the partnerships, and that he retained some amount of money. XXXI R. 4625–60; XXXIV R. 5354–55.

There was evidence that many of the loans were never paid. XXI R. 1450–62; XXIII R. 2036. *But see* XXI R. 1546–47; XXIX R. 4023–24. When the plan began to fall apart, Daily at first gave assurances, XXV R. 2602–04, 2712–13, but then asked investors to take out more loans. XXII R. 1845–46, XXV R. 2713; *cf.* XXXII R. 4774 (noting in another context that Daily "was a great talker" and was always ready to give assurances). As for Daily's personal guarantee, he paid $200,000 on his own note, and then told investors he had no money. XXII R. 1861–65; Government Ex. 1258, at 9–10, 60–72, 126.

19. Although there is less evidence relating to Figge than to Daily, we conclude that there is adequate evidence to support his conspiracy

In sum, in light of the prejudicial error in the charge which impacted both defendants, the judgments in Numbers 88–1626 and 88–1627 must be reversed and the cause is remanded for further proceedings on those matters. In Number 89–3333, the appeal is dismissed as moot for reasons stated above. See *supra* note 2.

## ORDER ON REHEARING

### March 1, 1991.

Before HOLLOWAY, Chief Judge, McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY and EBEL, Circuit Judges, and SEAY, Chief District Judge.*

On consideration of the plaintiff-appellee's petition for rehearing and rehearing en banc, a majority of the panel, Judge Holloway and Judge Ebel, conclude as follows, Chief Judge Seay voting to grant rehearing by the panel:

*First*, the government argues that the refusal of the defendants' requested character evidence instruction was not preserved for appeal and may not be noticed as plain error under Rule 52(b), Fed.R. Crim.P. We note that except for a trivial and inconsequential change of one word,[1] the well-recognized character and reputation defense instruction was specifically requested by the defendants. 1 *Federal Jury Practice* § 15.25. When defense counsel were advised it would not be given, at the instruction conference a general request was renewed by them that all requested instructions be given and that defendants objected to their being denied. XXXV R. 5743.

■ We have held that tendering of instructions which were not given, and a mere statement that they fit the case and should be given, does not preserve the issue. *United States v. Martinez*, 776 F.2d 1481, 1484 (10th Cir.1985). Our opinion in the instant case did not hold, and we do not now hold, that in all instances the failure to give such a character instruction as was requested here is plain error. Nevertheless we remain convinced that on this record, and due to the particular circumstances of the issues at this trial, we should notice the error of rejection of the critical instruction.

The sole conviction that resulted and is before us was that on Count 30, a charge that Daily and Figge conspired, in violation of 18 U.S.C. § 371, to commit wire fraud (18 U.S.C. § 1343) and to submit false statements as to matters within the jurisdiction of a federal agency (18 U.S.C. § 1001). Such a *crimen falsi* is a paradigm case for consideration of evidence of good character or reputation. *Edgington v. United States*, 164 U.S. 361, 363, 17 S.Ct. 72, 73, 41 L.Ed. 467 (1896); see *Unit-*

---

conviction also. There was evidence presented which tends to show that Figge himself was heavily involved in some of the recruiting activities. XVI R. 2–4; XXIV R. 2269–77, 2344–49, XXXIV R. 5550–57. He was present at the recruiting meetings and sometimes elaborated on what Daily said. XXII R. 1827; *see also* Government Ex. 1253, at 34–40; Government 1257, at 13–14. Figge also represented that there was little risk, XXIV R. 2346–48, XXXIV R. 5556–57, and substantial profit to be made in the partnerships. XXXIV R. 5551. However, Figge knew of the sluggish state of the real estate market in Hawaii. XXXIV R. 5556–57. When the projects ran into trouble, Figge called investors to a meeting, where he and Daily asked them to take out more loans. XXII R. 1845–46.

Figge told some investors to submit to him a draft application, and a signed, blank one as well. XXXIV R. 5552–53. In some cases, investors were told to give applications to either Daily or Figge (who would then forward the applications to Daily). XXII R. 1836. One application later turned up bearing the name of the investor's wife, as well as the name of the investor, with incorrect personal information, and false references. XXIV R. 2350–53. There was also evidence that Figge falsified a loan application. XXI R. 1468–70.

Further, Figge was a general partner in some of the partnerships, XX R. 1280–82, and in some cases he had the power to write checks from the partnership accounts. XXII R. 1664–65. Moreover, testimony indicated that checks were written to Figge out of partnership accounts. XXIX R. 3849–50; *see also* XXXI R. 4628–33. There was also evidence that he retained control of some property and that he benefited financially. XXXI R. 4625–33. A reasonable jury, then, could find Figge guilty of the conspiracy offense beyond a reasonable doubt.

---

* Honorable Frank H. Seay, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

1. In paragraph 3 of the requested instruction, defendants submitted an instruction stating that in light of reputation evidence inconsistent with traits involved in committing the offense charged, the jury may think it improbable "that a person of good character in respect of those traits would commit such a crime." (Emphasis added.) The instruction in 1 *Federal Jury Practice* § 15.25 uses the word "to" instead of "of."

ed States v. Darland, 626 F.2d 1235, 1237 (5th Cir.1980), cert. denied, 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982). Here such evidence was presented by both defendants through their own testimony and other testimony.

Daily called witness Burkhart who worked directly with Daily in the Air Force on the Pacific Inspection General's team. XV R. 3. He later came to work for Daily as an office manager in 1979. He said Daily's training book for office workers instructed that their activity be conducted so that "it's legal and ethical." Id. at 10. Burkhart said he still considered Daily an honest man and had no reason to doubt the basis of their friendship established 13 or 14 years earlier, although Burkhart had lost his savings and investment in the business venture with Daily. Id. at 21–22. Daily testified about his 24 years of Air Force service; his several meritorious commendation medals and two bronze stars for valor; his assignment to the Pacific Air Force Inspector General's team. Daily's recognition for trustworthiness was shown by his testimony that he held a top secret security clearance from the time he was a first lieutenant, which followed investigation of his background to "make sure you are a reputable, upstanding man and they go into your complete background." Daily had more than one such clearance, having checks when he went to Viet Nam and when he went to a Pentagon assignment, with the F.B.I. investigating his background to see if he was worthy of the responsibility of a top secret clearance. XII R. 13–14, 20–22.

Thus as to Daily there was substantial evidence introduced of good character and reputation through witness Burkhart and also by Daily himself, which is permissible. As the Ninth Circuit has stated: "Unlike character witnesses, who must restrict their direct testimony to appraisals of the defendant's reputation, a defendant-witness may cite specific instances of conduct as proof that he possesses a relevant character trait such as peaceableness." United States v. Giese, 597 F.2d 1170, 1190 (9th Cir.1979) (footnote omitted), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). See also McCormick on Evidence § 191, at 568 (E. Cleary 3d ed. 1984) ("By relating a personal history supportive of good character, however, the defendant may achieve the same result.") [hereinafter McCormick].

As to Figge, there was likewise substantial evidence of good character and reputa-

tion by Figge's testimony and other testimony. There was testimony by Mr. Young, a certified public accountant, who did accounting work on Figge's tax returns, tax work for his partnerships and tax planning. XXXIV R. at 5341–5344. Young dealt with Figge directly for several years. Young testified that Figge never tried to "hide things" in his tax returns; Young never had trouble in getting answers to questions and Figge was always able to respond; and Figge never requested any deletion or alteration of anything during such work. Id. at 5369–70.

Figge testified that he worked for Northrop for several years; that during military projects he worked on, he had secret clearances nearly all the time; that F.B.I. agents and others investigated his background; these clearances were updated; the security clearances were held by Figge since his first work with Northrop in 1952 and up to an administrative termination until this trial was finished. Figge described his community activities such as being Budget Chairman for his homeowners' association in his condominium complex of about 368 units; he served on the Board of Trustees for his church for some four years; he was also elected to a national board of directors for the Junior Chamber of Commerce and to three international offices of the organization, and Figge received one of their highest honors, a lifetime membership, and was elected president of the California center in 1972 of the Jaycees. Id. at 5404–11. Thus Figge himself also presented substantial character evidence which is permissible, as noted above. McCormick, supra, § 191 at 568.

Since, as noted, there was testimony by the defendants and by others on their behalf as to the character and reputation issue, we need not decide whether a defendant by his testimony alone may place his character in issue.

■ Along with the extent of character evidence presented for the defendants, we note the defendants' acquittal on numerous charges and their convictions on the conspiracy charge alone. Moreover, the jury's deliberations extended for three days, with a pause only for the Christmas holiday, before the guilty verdicts were returned. In light of all these circumstances, we are constrained to hold that refusal of the requested instruction was plain error affecting substantial rights to a fair trial, an error we should notice. Rule 52(b), Fed.R. Crim.P.; see United States v. Logan, 717

F.2d 84, 88, 91–92 (3d Cir.1983) (determination on plain error depends upon facts and circumstances, plain error being found); *cf. Darland,* 626 F.2d at 1237.

We do not diminish the importance of the general rule provided in Rule 30, Fed.R. Crim.P., requiring a distinct objection to a charge or to the refusal of an instruction. We hold only, in accord also with the rules, that under Rule 52(b), plain error should be found here in the refusal of such a requested instruction, considering "the record from all four corners." *United States v. Munz,* 504 F.2d 1203, 1209 (10th Cir.1974).

Accordingly, the petition for rehearing by the panel is DENIED by order of Judge Holloway and Judge Ebel. Chief Judge Seay voted to grant rehearing by the panel. A request for a poll having been made, the suggestion for rehearing en banc was considered by all the active judges of the court and denied by them, Judge Baldock voting to grant rehearing en banc. Accordingly, the suggestion for rehearing en banc is DENIED.