**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Leigh Randolph SHERMAN, a/k/a Randy Sherman, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Milton SHERMAN, a/k/a Mickey Sherman, a/k/a Joe Martin, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Anthony Martin CERASE, d/b/a Cisum Co., Cisum, Inc., Defendant-Appellant.**

**Nos. 76–2119 to 76–2121.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 24, 1978.

Decided May 19, 1978.

Rehearing Denied June 22, 1978.

John Romig Smith of Oyler & Smith, Oklahoma City, Okl., for defendants-appellants Leigh Randolph Sherman and Milton Sherman.

Herbert H. Galchinsky of Grossman, Galchinsky, Silverstein & Grossman, Denver, Colo., for defendant-appellant Anthony Martin Cerase.

John E. Green, Acting U. S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

Before McWILLIAMS, BREITENSTEIN and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Leigh Randolph "Randy" Sherman, Milton Sherman and Anthony Martin Cerase were each convicted by a jury on one count of conspiracy to violate copyrights of sound recordings (under 18 U.S.C. § 371) and eighteen counts of specific infringement of copyrighted sound recordings (under 17 U.S.C. §§ 1(f) and 104). On appeal they contend that the trial court erred: 1) in denying motions to suppress evidence obtained in a search conducted pursuant to a search warrant; 2) in refusing to require the government to disclose the name of a confidential informant named in the affidavit used to obtain the search warrant; 3) in instructing the jury that copyrights introduced at the trial were valid as a matter of law; and 4) in denying defendants' motions for acquittal based upon insufficiency of the evidence.

The statutes under which defendants were convicted prohibit willfully duplicating for profit copyrighted sound recordings, without the consent of the copyright holder. The government alleged that the defendants conspired together and manufactured and distributed, on a nationwide basis, 8-track reproductions of musical compositions which they pirated from records of such famous singers as John Denver, Glenn Campbell, Bob Dylan and Loretta Lynn.

The evidence was undisputed that at least the musical tapes were manufactured under the supervision of defendant Cerase, in a building in Oklahoma City owned by defendant Randy Sherman. Many of these tapes were sold by defendant Milton Sherman operating under the name Joe Martin.

The tapes were sold as being "sound-a-likes" or simulations of the famous artist's performance; that is, they purported to be imitations of John Denver, in one example, by someone else trying to sing as Denver would. The evidence of the Government, believed by the jury, is that these reproductions were copied from real John Denver and other artists' copyrighted records, and hence were not "sound-a-likes" or simulations at all.

We will discuss the evidence in detail below where required to consider the specific contentions of the parties in the appeal.

I

The defendants assert that the evidence seized at One Northeast 7th Street, under authority of a search warrant, should be suppressed on the grounds the supporting affidavit fails to comport with the standards required by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1963) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)

and, in any event, the facts recited in the affidavit are too remote in time to justify a finding of probable cause at the time the warrant was issued. Where reliance is upon an informant *Aguilar* requires the magistrate to be advised of some of the circumstances from which it is concluded crimes are occurring at the situs of the proposed search, and the affiant's basis for believing the informant is trustworthy. If the affidavit is defective by these standards, *Spinelli* permits the issuing magistrate to consider the other allegations in the application corroborating the informant's tip to determine whether the reliability demanded sufficiently exists to find probable cause.

■ In the affidavit submitted to the judge to support the application for a warrant to search the premises at One Northeast 7th in Oklahoma City, reference was made to five confidential informants. The agent made no express statement as to any of them that he believed they were reliable and giving facts supporting that belief. But as to confidential informants 2 and 4 the affidavit sets forth additional facts demonstrating support of the reliability of those statements. And the affidavit contains other information gathered by the agents or from sources who are identified which has the effect of supporting the allegations made by the confidential informants.

Thus confidential source 2 advised of his contact of "Joe Martin" at a particular telephone number, receipt of advertising containing a particular name and address from which to order. That source advised that he purchased tapes from the Cisum Co. at that address, identified the tapes, and said he took them for testing by United Artists Records. Then the affidavit goes on to report that FBI Special Agent Altpeter received information from the Director of Recording of United Artists Records that two of the songs were "identical to songs on copyrighted United Artists' albums with no noticeable alterations, overdubbing, or speed changes." The affidavit states the copyrights were verified, and advice had

been obtained that defendants were not licensed to duplicate or manufacture the songs.

Various statements in the affidavit link defendants and the One Northeast 7th address to the tapes secured through confidential sources 2 and 4, and suggest that place as the source of the manufacturing operation. This includes FBI Agent DeWitt's checking of postage and address listings, and agent surveillance.

The supporting evidence presented to the judge who issued the warrant was significantly more supportive of the warrant than that struck down in *Spinelli*. We do not believe the affidavit must recite why it is believed that the findings of the United Artists Records' Director of Recording are reliable when he is identified. The judge is to apply common sense in his reading of the affidavit. *Spinelli* also states, 410 U.S. at 419, 89 S.Ct. at 590–91:

In holding as we have done, we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray v. Illinois,* 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, [18 L.Ed.2d 62] (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, [13 L.Ed.2d 684] (1965); and that their determination of probable cause should be paid great deference by reviewing courts, *Jones v. United States,* 362 U.S. 257, 270–271, 80 S.Ct. 725, 735–736, [4 L.Ed.2d 697] (1960). . . .

■ Defendants' related contention is that the facts recited in the affidavit are too remote in time to justify a finding of probable cause when the warrant was issued. Some of the times recited are remote and we believe essentially irrelevant. But

most were within the time span of the conspiracy alleged. In response to a similar argument this Court held the nature of the activity must be taken into consideration, and when the activity is of a protracted and continuous nature the passage of time diminishes in significance. *United States v. Johnson,* 461 F.2d 285 (10th Cir. 1972). The allegations in the affidavit indicate a manufacturing and distributing operation continuous in nature. There was no error in denying defendant's motion to suppress.

## II

■ It is argued that the name of the person identified as confidential source No. 5 in the affidavit used to obtain the search warrant must be disclosed, as that person claimed to be present when a criminal act occurred. Under *Garcia v. United States,* 373 F.2d 806 (10th Cir. 1967) the defendant may obtain the identity of an informer if his testimony might be relevant to defendant's case and justice would be best served by disclosure.

■ We do not read the statement in the affidavit as necessarily indicating that No. 5 personally observed criminal activity. That paragraph states merely that, "source advised that the premises *had been* used for the manufacture of bootleg tapes in violation of copyright laws," and that on the particular day he or she was on the premises various described items of tape producing equipment were there. In any event defendants presented no evidence to support a finding disclosure would be helpful to their defense. The facts furnished by the source were cumulative to information already alleged in the affidavit by the government. The informant's knowledge was unnecessary to the presentation of the government's case. Under these circumstances there was no error in the denial of the request.

1. 17 U.S.C. § 104(b), at the time of the offense, provided:

 "Any person who willfully and for profit shall infringe any copyright provided by § 1(f) of this Title, or who should knowingly and willfully aid or abet such infringement, shall be fined

## III

■ The defendants argue that the trial judge erred in instructing the jury that the copyrights were valid as a matter of law, and in not submitting that question to the jury. At trial defendants stipulated to the validity of several of the copyrights in question, and this stipulation is binding upon them. *United States v. Harding,* 475 F.2d 480, 484 (10th Cir. 1973). At the time of the instruction no objection was made by any of the defendants. In view of this, the defendants' stipulation to seven of the eighteen copyrights and their failure to present any evidence to contradict the prima facie validity of the copyright certificates introduced on the remaining counts, we can find nothing in the judge's treatment of the issue to justify applying the "plain error" rule.

## IV

■ Finally, the defendants contend the evidence is insufficient to support the finding that they acted willfully. Willfulness, of course, is an essential element to the conviction on both the conspiracy and substantive counts.[1] They further assert, particularly defendants Randy Sherman and Milton Sherman, there was no evidence of an agreement among the defendants, to tie them into a conspiracy. This Court has considered both issues on many prior occasions.

■ A conspiracy need not be proven by direct evidence, but may be established by circumstantial evidence and the common purpose inferred from the development or combination of circumstances. In fact the evidence need not conclusively exclude any other reasonable hypothesis nor negative all possibilities except guilt. *United States v. Jackson,* 482 F.2d 1167 (10th Cir.), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974).

not more than $25,000 or imprisoned not more than one year, or both, for the first offense and shall be fined not more than $50,000 or imprisoned not more than two years, or both, for any subsequent offense."

Willfulness is rarely provable by direct evidence, and most often can be proven only by inference from the evidence introduced. *United States v. Dorman,* 496 F.2d 438 (4th Cir.), *cert. denied,* 419 U.S. 945, 95 S.Ct. 214, 42 L.Ed.2d 168 (1974). In *United States v. Woodring,* 464 F.2d 1248 (10th Cir. 1972) this Court held that where specific intent is an element of a crime it must be proven as an independent fact or clearly inferred from the evidence. *See also Van Nattan v. United States,* 357 F.2d 161 (10th Cir. 1966).

Here the element of willfulness is at issue because the defendants contend that they did not know the tapes were pirated, but thought they were indeed manufacturing and selling "sound-a-likes." They assert that the songs at issue were purchased from Tyler Tape Productions, Inc., of Tyler, Texas, operated by one Bill Carr, under a contract which asserted that he was providing Cisum Co. with "sound-a-like" simulations of the original artists.

 Upon review of convictions by a jury we must look at the evidence in the light most favorable to the government. *See, e. g., United States v. Wright,* 450 F.2d 992 (10th Cir. 1971). So viewed we hold the evidence was sufficient to support the jury's necessary finding that these defendants knew the tapes were not simulations but the real performances of these famous artists.

In its presentation the Government presented overwhelming proof that the song performances were copyrighted, that the Cisum Co. reproductions were not simulations but were taken from the original artists' recordings or tapes, that Cisum produced many tapes and sold them over a wide area as a profit-making business. It showed there were no sound stage or other facilities on the One Northeast 7th premises where the tapes were manufactured to enable performing groups to make new master tapes. Its evidence, which will be reviewed below, tried to tie the three defendants together in the enterprise. But the government did not go into the alleged contract with Tyler Tape Productions, Inc., or present anything on that.

The government presented enough on this issue of willfulness and intent. It was not its duty to anticipate the defendants' evidence. Where the defendants set up the distinct contract as the source of their master tapes with respect to the song performances at issue, they had to present evidence sufficiently convincing to the jury to blunt the thrust of the government's proof.

Defendant Cerase testified that he entered the contract with Tyler Tape Productions, and introduced the contract into evidence. That contract was undated, not notarized, and called for payments of only $50 per song in one place, and $50 per tape in another. The contract was considerably different from those with other sound-a-like artists or producers introduced into evidence by defendants. No payments were shown to have been made to Tyler Tape Productions or to Bill Carr; in fact the cancelled checks and stubs of what were apparently all checks drawn by Cisum show none drawn in favor of either Tyler Tape Productions or Carr. Carr was not produced as a witness, and Cerase's testimony was simply that Carr provided him with "the quarter-inch master." Other evidence was that one-inch tapes were necessarily used as the masters for production purposes. The jury apparently either disbelieved the genuineness of this contract, or believed that defendants were not innocent of knowledge that the tapes provided were copies from the original artists' records.

 Finally we have Randy Sherman's and Milton Sherman's claims that there was not sufficient evidence to tie them into being a part of the Cisum Co. operations with Cerase, as coconspirators. Randy asserts he was only landlord and friend of Cerase. Milton claims to be only a salesman of tapes for Cerase's Cisum Co.

There was considerable evidence from which the jury could infer Randy Sherman was a partner or coowner of Cerase's Cisum Co. operation. Cerase's own testimony at trial was that, "The name of my business was Cisum Company and I was in business with Randy Sherman." This testimony is

corroborated by independent evidence that Randy (or his company) owned the building and the equipment in and with which the tapes were manufactured; he received $3,000 per month payments designated as rent. He introduced Cerase to the printer who printed the Cisum tape labels, said he was standing behind Cisum's credit and guaranteed payment of the Cisum bills. At least one letter containing an order form in evidence was addressed to "RANDY SHERMAN, CISUM;" Randy was frequently on the premises; he filled out the employee time cards and made out the payroll of Cisum each payday. He was present when Cerase talked to the employees to establish their wages. When there was a bookkeeping problem a Cisum employee stated she attempted to call Randy about it. The printer sent Cisum printing bills to Randy's attention after the FBI closed the tape operation. Randy paid the utility bills on the premises. He received checks from Cisum other than for rent and endorsed a Cisum check made out to cash. Miant, a company apparently owned by him, made large advances for taping materials bought for Cisum and was reimbursed by Cisum checks. The evidence showed Cerase was 22 years old, had worked for Randy Sherman previously, had no funds to get started in the tape manufacturing business and was utterly dependent upon the Shermans' building, equipment, advances, guarantees and contacts. There is ample evidence from which the jury could infer that Randy Sherman was more than landlord and friend in this operation.

The evidence tying Milton Sherman to the manufacturing operation is not as strong. He was benefitting financially from the tape sales, as he received checks for his services made out to his alias "Joe Martin," and the phone bills for his sales pitches were paid by Cisum. Some tapes were shipped through his Homa Records Company. That company's name was prominently displayed on the outside of the building where Cisum operated. He identified himself as "Joe Martin of Cisum Co." to at least one dealer. His conversation with an investigator which was tape recorded contains references from which it could be inferred he was a part of the Cisum Company.

There is much evidence that Milton Sherman and Randy Sherman operated under various company names and had many dealings together. The exact ownerships are not clear. For example, the printer stated that after the FBI shut down the Cisum operation he sent Cisum's bills to Homa (owned by Milton Sherman) with the expectation that Randy Sherman would see they were paid. In addition to Homa's name being prominently displayed on the building where Cisum operated, there were on the premises tapes of Sound Values, apparently a Milton Sherman company, and before Cisum took over Milton Sherman admitted that he officed in the building for a while and had a headquarters of a company he owned named Quad Enterprises there. On literature in evidence sent out by Milton Sherman advertising tapes he uses the name The Tape Factory, and gave the same post office box address as Cisum Co.

The key question for purposes of this case is not whether Milton Sherman was technically a partner or coowner of Cisum Co., but whether he was a coconspirator so far as the pirated tapes are concerned, so that if the evidence supports the finding that the others knew the tapes were the real thing and not sound-a-likes that he knew also. The evidence shows he had a financial stake in the sales of the tapes, and we believe also supports the jury finding that Milton Sherman knew what Randy Sherman and Anthony Cerase knew about the tapes.

The judgment of the district court is affirmed in all respects.