FILED
United States Court of Appeals
Tenth Circuit

February 7, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BC TECHNICAL, INC.,

      Plaintiff-Counter-Defendant-
      Appellee/Cross-Appellant,

v.

ENSIL INTERNATIONAL
CORPORATION, a New York
corporation,

      Defendant-Counter-Claimant-
      Appellant/Cross-Appellee.

No. 09-4011 & 09-4019
(D. Utah)
(D.C. No. 2:02-CV-700-TS-SA)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **SEYMOUR**, and **O'BRIEN**, Circuit Judges.

The jury found Ensil International Corporation (Ensil) (1) breached a contract with

BC Technical, Inc. (BC) by failing to repair damaged circuit boards and (2) converted

BC's property by unreasonably refusing to return the circuit boards BC had

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id*.

sent for repair. Before the jury retired for deliberations, Ensil moved for judgment as a matter of law. Following the trial, Ensil again moved for judgment as a matter of law and/or a new trial. The district court denied the motions. Ensil appealed from the court's judgment and the denial of its post-trial motions.[1] BC cross-appeals from the district court's denial of its motion for prejudgment interest.

Ensil contends the verdict cannot stand because its contract with BC was illegal and unenforceable under the Copyright Act and Utah law. It also contends BC's conversion claims must fail because, without valid expert testimony establishing the unrepaired circuit boards were, in fact, repairable or, in the alternative, that non-repairable boards had value, there is no evidence of BC's actual losses either from a breach of contract or conversion. Ensil also claims the conversion claim must fail for two other reasons -- it had a lawful justification for retaining the circuit boards and BC's claim was barred by the economic loss rule. In the alternative, Ensil claims it is entitled to a new trial because the jury instructions and verdict form resulted in prejudicial error and the district court improperly admitted the testimony of BC's damages expert. We affirm.

## I. FACTUAL BACKGROUND

BC Technical was formed by Charles Hale, its President and CEO, to service nuclear medical imaging devices and peripheral devices such as gamma cameras[2] and

---

[1] Our jurisdiction derives from 28 U.S.C. § 1291.

[2] Nuclear gamma cameras take images of a patient who has been injected with a radioactive pharmaceutical. This pharmaceutical "goes to certain organs and certain parts

magnetic resonance imaging (MRI) equipment. As part of its services, BC offered a repair exchange program whereby it would provide its customers with used, but functional, circuit boards in exchange for a fee and the customer's defective circuit boards. The defective circuit boards in some instances contained malfunctioning integrated circuits referred to as PROMs.[3] During the relevant time period, 2001-2002, BC did not have the capability to repair all of the defective circuit boards it received from its customers. Its shortcoming was, seemingly, met by Ensil.

Ensil International is a New York corporation with offices in Lewiston, New York. It sought customers needing repair of electronic circuit boards. On February 28, 2001, Ensil emailed BC an advertisement declaring its specialization in "Repair, Rework, Test and Inspection of electronic circuit boards and assemblies for Medical/Clinical, Scientific and Industrial Applications." (Appellant's App'x Vol. VI at 1461.) In response, Hale called Ensil to discuss whether it could repair BC's defective circuit boards. He spoke with Ken McDowell and described the defective circuit boards. McDowell assured Hale that Ensil could make the necessary repairs. McDowell did not mention any limitations on Ensil's repair capabilities or potential software license issues. During the following months, the parties continued to correspond and exchange

---

of the body" and "lights them up" for the cameras. (Appellant's App'x Vol. IV at 1042, 1047.)

[3] "PROM" is an acronym for "programmable read only memory." (Appellant's App'x Vol. IV at 1051-52.) It is an electronic device that can be programmed with software using a device known as a PROM "programmer" or "burner." (Appellant's App'x Vol. IV at 1052.) The software embedded onto a PROM is sometimes known as "firmware." (Appellant's App'x Vol. IV at 1052-55.)

information about BC's defective circuit boards.

On April 3, 2001, McDowell sent an email to Hale stating Ensil had "all information needed to repair" BC's damaged circuit boards and once Ensil received the boards, it would "generate an estimate for [BC] based on time and materials needed to complete each repair." (Appellant's App'x Vol. VI at 1464). On April 25, 2001, BC sent Ensil 28 circuit boards for inspection. On May 1, 2001, Ensil provided BC with its initial estimate of repair costs. Shortly thereafter, the initial estimate was negotiated down to $27,400. BC paid Ensil $15,000 to begin repairs. Without any express mention of copyright concerns, Ensil agreed to repair BC's twenty-eight circuit boards in a six to ten day turn-around period.

Ensil's repairs did not proceed as planned. The difficulties resulted in a number of circuit boards being shipped back and forth between the parties throughout the remainder of 2001 in an apparent collaborative effort to accomplish the necessary repairs. Ultimately, Ensil successfully repaired five or six circuit boards.

In January of 2002, BC called Ensil and demanded the return of its remaining circuit boards. The parties engaged in discussions through May 2002 regarding the return of the unrepaired circuit boards. On May 9, 2002, Ensil faxed a letter requiring BC to sign for the return of the circuit boards. The letter contained the following language:

> I ____ on (DATE) _____ have instructed Ensil International to return all product to BC Technical in as is condition, as is condition is understood by both parties to be (not re-assembled, not re-verified, as received)

(Appellant's App'x Vol. VI at 1538.) Ensil claimed that due to it being an "ISO quality

organization"[4] the letter was really a "standard ISO form" which BC was required to sign before Ensil could return the circuit boards. (Appellant's App'x Vol. IV at 1096; Appellant's App'x Vol. VI at 1538.) Upon receipt of this letter, Hale inserted handwritten notations stating:

> As an ISO quality organization it must be understood that these units have been in Ensils [sic] possession for well over a year and Ensil has attempted to repair these without any success. These units have been sent to BC Technical to see if their repair was successful many times and to date none have been repaired.

(Appellant's App'x Vol. VI at 1539.)

Hale signed the amended form on behalf of BC and sent it back to Ensil. Due to Hale's notation, Ensil refused to return the circuit boards at that time. As a result, on July 22, 2002, BC brought suit against Ensil. The circuit boards were not returned until December 2005.

*PROM Repair*

Some circuit boards contained malfunctioning PROMs. To repair a damaged circuit board with a defective PROM, the following steps are required: (1) the software of a fully functional PROM of the same type must be copied to a PROM burner; (2) the

---

[4] ISO is the short name for the International Organization for Standardization. The organization develops standards at the request of industry groups. It engages in a detailed process and eventually publishes an international standard on the requested subject. *How ISO Develops Standards*, ISO - Int'l Org. for Standardization, http://www.iso.org/iso/about/how_iso_develops_standards.htm (last visited Dec. 20, 2011). Because the acronym would change depending on the language or country, its founders decided to give it a short all-purpose name. "ISO" is derived from the Greek *isos*, meaning "equal." The short form of the organization's name is always ISO. *Discover ISO: ISO's Name*, ISO – Int'l Org. for Standardization, http://www.iso.org/iso/about/discover-iso_isos-name.htm (last visited Dec. 20, 2011).

software can then be burned onto a new blank PROM; and (3) the newly burned PROM can then be installed in place of the defective one.[5]

The PROM software at issue here was written by the third-party manufacturer of the circuit boards, ADAC Laboratories (later acquired by Philips). The title page of ADAC's manuals for the subject circuit boards stated all "information and drawings set forth in this document and all rights in and to inventions disclosed herein . . . are the exclusive property of ADAC Laboratories . . . No copies of this information or drawings shall be made without the prior consent of ADAC Laboratories." On each additional page, the manuals stated in the lower left-hand corner: "This information is proprietary to products manufactured by ADAC Labs. The design is the exclusive property of ADAC Labs and is not to be used or duplicated without written consent." Additionally, according to the testimony of ADAC employee Dr. Koops, who wrote the software for the PROMs, the subject software was copyrighted and proprietary and the source code contained a statement to this effect. However, the actual code on the PROMs at issue did not contain this warning.

Although Ensil now claims copying the PROMs would violate federal and state law, no issues arose between the parties regarding copyright concerns in connection with the repair of the circuit boards until the commencement of this litigation.[6]

---

[5] Although Ensil points out that the PROM burner can store the firmware it has copied, and this stored firmware then can be copied to other PROMs, nothing in the record suggests BC requested Ensil do so.

[6] At oral argument, this Court pointedly asked BC's counsel about the timing of Ensil's copyright concerns. According to BC's counsel, the first time Ensil raised a

## II.  PROCEDURAL BACKGROUND

On July 22, 2002, BC filed a diversity suit against Ensil in the District of Utah. BC's third amended complaint asserted claims for breach of contract and conversion. The parties filed numerous pre-trial motions.  Relevant here, Ensil moved to strike the report from BC's damages expert, L. Scott Kimber, and exclude his testimony.  Ensil argued Kimber's failure to use the appropriate time frame for his calculations rendered his methodology unreliable and his conclusions speculative.  The court denied the motion.

A five-day jury trial began on July 14, 2008.  Over Ensil's objection, BC introduced Kimber's testimony about its lost profits.  According to Kimber, BC lost a total of $153,986.

On the fourth day of trial, the judge held an instruction conference.  At the conference, Ensil objected to the court's proposed jury instructions regarding the legality of the contract[7] and lost profits.[8]  Ensil also objected to the general verdict form, proposing a special verdict form which included a question as to whether the contract required it to copy software onto PROMs. The court rejected Ensil's proposed special verdict form.  As to the legality of the contract, the judge explained it was an issue for him to decide and he would instruct the jury accordingly.  Ensil objected to his proposed

---

copyright concern was at the start of this litigation.  Ensil's counsel did not argue otherwise.

[7] Ensil claimed the contract was illegal under federal and state statutes.

[8] Before the jury was instructed, Ensil again objected to the jury instruction on lost profits.

instruction. The judge then permitted the parties to revise the wording of the instruction; the result was the final version given to the jury.

Before the case was submitted to the jury, Ensil moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. It argued: (1) BC failed to establish Ensil caused it to suffer damages; (2) the contract was illegal and unenforceable; (3) BC's conversion claim was barred by the economic loss rule; and (4) BC failed to provide sufficient evidence for punitive damages. The judge denied Ensil's motion on the first three issues but dismissed BC's claim for punitive damages.

The jury found in favor of BC on both the breach of contract and conversion claims and awarded damages of $159,100. Ensil timely filed a renewed motion for judgment as a matter of law reiterating its position that the contract was illegal and unenforceable under state and federal law. The court denied the renewed motion and concluded: (1) Ensil failed to carry its burden of showing the contract required Ensil to violate the law; (2) even if it had done so, the contract was still enforceable.

On September 15, 2008, BC filed a proposed judgment which included prejudgment interest. The same day, the Clerk of Court entered judgment in favor of BC without an award of prejudgment interest. In response, BC filed a Rule 59(e) motion to alter or amend judgment seeking to include prejudgment interest in its award.

On September 29, 2008, Ensil moved for judgment as a matter of law and/or a new trial. As to the conversion claim, it argued for judgment in its favor because: (1) it did not "unqualifiedly refuse to return the subject circuit boards and had a legal justification for keeping the boards;" and (2) "there was no legitimate basis for an award

- 8 -

of damages on the conversion claim" because BC failed to offer expert testimony that the circuit boards were repairable. (Appellant's App'x Vol. II at 533) Ensil claimed it was entitled to a new trial on the breach of contract claim because: (1) "the damages awarded on the conversion claim must be disallowed, and it is impossible to determine what portion of the damage award resulted from the breach of contract;" and (2) the jury instruction on the illegal contract issue, combined with the judge's failure to ask the jury (in a special verdict form) whether Ensil agreed to copy PROMs, caused jury confusion resulting in prejudicial error. (Appellant's App'x Vol. II at 533)

Rejecting these arguments, the court denied Ensil's motion for judgment as a matter of law and/or new trial.[9] It also denied BC's motion to amend the judgment to include pre-judgment interest, reasoning that the damages were too imprecise to warrant pre-judgment interest. Ensil timely filed a notice of appeal and BC gave notice of its cross-appeal.

### III. ENSIL'S APPEAL – NO. 09-4011

We apply state law in a diversity case such as this, except for matters governed by the "Federal Constitution or by acts of Congress. . . ." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216-1217 (10th Cir. 2011). Here we apply Utah law. Ensil repeats the arguments made to the district court, which claim the court erred in: (A) denying its motion for judgment as a matter of law; (B) instructing the jury and crafting

---

[9] The court recognized Ensil's first argument may have been procedurally barred because it was not included in its Rule 50(a) motion, but determined it need not decide that issue as Ensil's Rule 50(b) motion failed on the merits.

- 9 -

the jury's verdict forms; and (C) admitting the testimony of BC's expert witness on damages.  The district court did not err.

## A.  Motion for Judgment as a Matter of Law or New Trial

Ensil argues (1) the contract was unenforceable because the contract required illegal conduct; (2) the economic loss doctrine bars BC from recovering for any conversion; and (3) the evidence was legally insufficient for the jury to conclude Ensil converted the retained circuit boards.

We review *de novo* the district court's denial of a Rule 50(b) motion for judgment as a matter of law.  *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir. 2004).  We apply the same legal standard as the district court, and draw all reasonable inferences in favor of the nonmoving party.  *Id.*

### 1.  Legality of the Contract

Ensil first claims the contract is unenforceable because it required Ensil to violate the criminal provisions of the federal Copyright Act and Utah Code § 76-6-404.

> Finding a contract illegal and unenforceable based on a penal statute requires three steps. The court must determine (1) what the terms of the contract are; (2) what the statute prohibits; and (3) whether the statute or public policy demands that the contract be deemed unenforceable.

*Peterson v. Sunrider Corp.*, 48 P.3d 918, 928 (Utah 2002).

*Federal Copyright Act: Criminal Infringement*

The Copyright Act's criminal infringement provision provides in pertinent part: "Any person who *willfully infringes* a copyright shall be punished under section 2319 of title 18, if the infringement was committed -- (A) for purposes of commercial advantage

- 10 -

or private financial gain. . . ." 17 U.S.C. § 506(a) (emphasis added). Whether one is liable under this provision depends, among other things, on the meaning of "willfully."

As the district court noted, this Court has not specifically interpreted the meaning of "willfully" as used in the statute, and the other circuits have come to differing conclusions about the meaning of the term.[10] Nonetheless, we agree with the majority view among the other circuits: the prima facie case for willful infringement requires a showing of specific intent to violate copyright law.

Willful infringement "is rarely provable by direct evidence, and most often can be proven only by inference from the evidence introduced." *United States v. Sherman,* 576 F.2d 292, 297 (10th Cir. 1978) And "where specific intent is an element of a crime it must be proven as an independent fact or clearly inferred from the evidence." *Id.* In

---

[10] A recent law review article commented:

> The third element of the criminal copyright offense is "willfulness." A majority of the courts have interpreted the term to mean that the government must show the defendant specifically intended to violate copyright law; however, the Second Circuit once took a different view, holding that "willfulness" requires only an intent to copy, rather than an intent to infringe.

Min Ae Yu et al., *Intellectual Property Crimes*, 45 Am. Crim. L. Rev. 665, 692 (2008) (citations omitted); *accord* Melville B. Nimmer & David Nimmer, 4 *Nimmer on Copyright* § 15.01 (2011) ("[T]he better view construes the 'willfulness' required for criminal copyright infringement as a 'voluntary, intentional violation of a known legal duty.'"); *see also Danjaq, LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001) (stating "one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary," has not acted willfully under 17 U.S.C. § 504(c)(2)) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B][3] (2000)).

*Sherman,* for example, the court concluded the evidence of willfulness was sufficient because the prosecution produced evidence showing the defendants knew the audiotapes they were manufacturing contained copyrighted material. *Id.* at 297-98.

No evidence of specific intent to violate copyright law exists here. Ensil argues Hale's experience and knowledge permits one to infer that he knew Ensil would have to illegally copy the PROMs in order to complete the contract. But the sole evidence of the parties' state-of-mind on this issue comes from Hale, who testified he had no knowledge of copyright issues regarding the PROMs before or during the performance of the contract. On the contrary, Hale testified that he specifically asked for advice from his legal counsel and was told that copying the software on the PROMs was legal "as long as it's part of the repair process." (Appellant's App'x Vol. III at 757A.) Moreover, the record does not indicate the parties had knowledge of copyright problems at the time of contracting[11] or during the time the contract was to be performed. Ensil raised no concerns about possible copyright infringement prior to this litigation. Ensil did present evidence that its general practice was not to copy proprietary information without authorization. It is undisputed, however, that the PROMs being repaired contained no notice that the material was proprietary and Ensil offered no evidence it was aware of the warnings in APAC's manual prior to beginning its contractual performance. Importantly, Ensil offered no evidence implying it knew the PROMs contained proprietary software at

_____

[11] Ensil inspected the boards containing defective PROMs before giving its repair estimates. It made no mention of copyright issues.

- 12 -

the time it was attempting repairs for BC.[12]  Ensil did not establish "willfulness" and,

therefore, the contract did not demand prohibited conduct so as to be unenforceable under

17 U.S.C. § 506(a).[13]

*Utah Code § 76-6-404:  Criminal Infringement As Theft*

Ensil also claims the contract's requirement to copy PROMs violates Utah's theft

statute, Utah Code Ann. § 76-6-404.  The statute states: "A person commits theft if he

obtains or exercises unauthorized control over the property of another with a purpose to

deprive him thereof."  Utah Code Ann. § 76-6-404 (West 2011).  BC argues the specific

language of the Copyright Act, 17 U.S.C. § 301(a), preempts application of Utah's theft

statute in this context.[14]  Section 301(a) provides that, starting January 1, 1978:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive
> rights within the general scope of copyright as specified by section 106 in
> works of authorship that are fixed in a tangible medium of expression and
> come within the subject matter of copyright . . . are governed exclusively
> by this title. Thereafter, no person is entitled to any such right or equivalent
> right in any such work under the common law or statutes of any State.

Ensil responds that federal preemption would conflict with 18 U.S.C. § 2319(a),

the statute which imposes penalties for criminal copyright infringement, because §

---

[12] Our review of the record reveals no attempt by Ensil to get permission from ADAC/Phillips to copy the software on to new PROMs or request for BC to do so.

[13] We need not address BC's argument that copying the proprietary material in the PROMs for the purpose of repairing the circuit boards is permissible under 17 U.S.C. § 117(c).

[14] "Whether § 301 of the Copyright Act preempts a state law claim presents a question of law that we review de novo on appeal."  *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1542 (10th Cir. 1996).

2319(a) states the copyright penalties are "*in addition to* any other provisions of title 17 or any other law" (emphasis added). Ensil cites no cases in support of this preemption argument, nor have we found any cases dealing directly with the interplay of these two statutory sections. Nevertheless, we have no difficulty in concluding the Copyright Act preempts the Utah statute in this context.

A state-law claim is preempted by the Copyright Act if: "(1) the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1146 (10th Cir. 2009) (quotations omitted).[15] And, as we have observed:

> The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law. *The declaration of this principle in section 301 is intended to be stated in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively*, and to avoid the development of any vague borderline areas between State and Federal Protection.

*Ehat v. Tanner*, 780 F.2d 876, 879 (10th Cir. 1985) (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 130) (emphasis added); *see also id.* at 877-78 (concluding unfair competition and unjust enrichment claims under Utah law were preempted because they

---

[15] In *R.W. Beck*, we held the Copyright Act preempted civil claims under Colorado law for unfair competition and unjust enrichment arising out of alleged infringer's activities despite the presence of a *scienter* requirement in the state law. 577 F.3d at 1149.

sought to provide relief for reproduction and distribution of materials "within the subject matter of copyright").

Moreover, other circuits considering whether the Copyright Act preempts state criminal law follow the tenor (if not the exact wording) of the rule in *R.W. Beck*. *See Crow v. Wainwright,* 720 F.2d 1224, 1226 (11th Cir. 1983) (concluding state criminal law was preempted because "[t]he prohibited act-wrongfully distributing a copyrighted work" was the same act prohibited under the Copyright Act); *see also Corcoran v. Sullivan*, 112 F.3d 836, 838 (7th Cir. 1997) (concluding state criminal law was not preempted because it created exclusive rights outside those in the Copyright Act); *Anderson v. Nidorf*, 26 F.3d 100, 102 (9th Cir. 1994) (concluding state criminal law was not preempted because it "does not prohibit the reproduction of copyrighted works, but rather prohibits selling recordings without disclosing the manufacturer and author of the recording (regardless of its copyright status)"); 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.01(B)(1)(k) (2011) ("Pre-emption applies whether the subject state law is civil or criminal in nature.").

Here, Utah Code Ann. § 76-6-404 is preempted by the Copyright Act because a conviction would be necessarily and solely based on the copying of material subject to the federal copyright laws. Ensil's own argument on the applicability of the Copyright Act demonstrates both that (1) the firmware at issue is within the subject matter of copyright and (2) it is the act of copying which constitutes the theft about which Ensil complains. Copying is one of the exclusive rights protected under the Copyright Act. *See* 17 U.S.C. § 106(1). As the Utah theft statute is preempted by federal law, Ensil is not

- 15 -

entitled to judgment as a matter of law on this issue.

2. Economic Loss Doctrine

Ensil also argues the district court erred in denying its motion for judgment as a matter of law because, in its view, BC's conversion claim is barred by the economic loss doctrine.

"The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *Hermansen v. Tasulis*, 48 P.3d 235, 239 (Utah 2002). The rule "serves two purposes. First, it bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to . . . property or bodily injury. Second, the economic loss rule prevents parties who have contracted with each other from recovering beyond the bargained-for risks." *Sunridge Dev. Corp. v. RB&G Eng'g, Inc.*, 230 P.3d 1000, 1006 (Utah 2010) (citations omitted). Utah, however, applies "an independent duty exception to situations where a contract exists between the parties." *Id*. at 1007 n.8. "The proper focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached." *Hermansen*, 48 P.3d at 240 (quoting *Grynberg v. Agric. Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)) (adopting Colorado's source of duty rule).[16] If the claim is not within the

---

[16] Both parties cite *Grynberg v. Questar Pipeline Co.*, a case requiring the Utah Supreme Court to construe *Wyoming's* economic loss rule. 70 P.3d 1 (Utah 2003). *Grynberg* is not relevant because it interprets Wyoming law rather than Utah law. *See id.* at 16.

contract's allocation of risks, but instead arises from an independent duty, the economic loss rule will not apply. *Id.*

Believing Ensil would not fulfill its contractual duties in January 2002, BC demanded Ensil return its circuit boards. From that date, BC did no more business with Ensil until the contract was terminated (no later than May of 2002) and it continued its demands for the return of the boards. S*ee Glenn v. Reese,* 225 P.3d 185, 190-191 (Utah 2009) ("It is generally accepted that a notice of termination or cancellation of a contract must be clear and unequivocal. . . . any inquiry into the adequacy of cancellation is on whether the notice is sufficiently clear to apprise the other party of the action being taken.") (citations and quotations omitted). Once the contract was terminated, Ensil had a duty to return BC's property. Failure to do so is conversion. *See Fibro Trust, Inc. v. Brahman Fin., Inc.*, 974 P.2d 288, 295-96 (Utah 1999) ("A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession. Conversion is concerned with possession, not title.") (quotations and citations omitted). Ensil did not return the circuit boards until December 2005. As a result, Ensil's retention of the circuit boards for three years after the termination of the contract was no longer governed by the contract's allocation of risk.[17] The economic loss rule does not bar damages for BC's conversion claim; Ensil was not entitled to judgment as a matter of law on this issue.

---

[17] Ensil claims its defense to the conversion was grounded in the contract (it had a contractual right to retain the boards until BC signed a release), but that does not make an independent tort (conversion) subject to the economic loss doctrine.

### 3. Sufficiency of the Evidence of Conversion

Ensil also argues BC failed to establish all the required elements of its conversion claim, because: (1) Ensil had possession of the circuit boards under a claim of right requiring BC to demonstrate "proof of demand and refusal" to return BC's property; (2) Ensil had a lawful justification for retaining the circuit boards; (3) BC did not make a written demand for Ensil to return the circuit boards -- instead, during a telephone conversation BC's President/CEO requested that Ensil send back the circuit boards -- which essentially was a request for the termination of the contract without all of the circuit boards having been repaired; and (4) BC did not prove it was entitled to immediate possession of the circuit boards when it filed its lawsuit. (Appellant's Opening Br. 27-28.)

BC contends Ensil forfeited these arguments because they were substantively raised for the first time in Ensil's <u>renewed</u> motion for judgment as a matter of law,[18] but we need not decide the issue. Even if Ensil properly asserted its argument, it is without merit. Because Ensil cannot show the evidence points but one way, judgment as a matter of law is improper. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996) ("Unless the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion, judgment as a matter of law is improper.") (citations omitted).

---

[18] Ensil raised these arguments only in a footnote in its initial Rule 50(a) motion. As a result, neither BC nor the district court addressed Ensil's arguments. It is therefore questionable whether Ensil preserved them for appellate review. *See Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1114 (10th Cir. 2005).

"A party alleging conversion must show that he or she is entitled to *immediate possession* of the property at the time of the alleged conversion." *Bennett v. Huish*, 155 P.3d 917, 928 (Utah Ct. App. 2007) (quotations and citation omitted). There was substantial evidence showing BC requested the return of its circuit boards and the conditions imposed by Ensil for their return were unreasonable.

### B. Instructional and Verdict Form Errors

Ensil also contends the district court made several errors in conducting the trial. In particular, Ensil argues the court abused its discretion in instructing the jury on: (1) breach of contract; (2) its illegality defense; and (3) calculation of lost profits. Ensil also argues the court abused its discretion in crafting the verdict form on these issues. We see no abuse of discretion.

"In a diversity case, the substance of a jury instruction is a matter of state law; however, federal law controls the determination of whether an error in the instructions requires reversal." *Hynes v. Energy W., Inc.*, 211 F.3d 1193, 1197 (10th Cir. 2000). A judge's decision whether or not to give a particular instruction is reviewed for abuse of discretion. *Id*. "As for the instructions themselves, we conduct a de novo review to determine whether, as a whole, the instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Id.* We also review verdict forms for an abuse of discretion. *United States v. Stiger*, 413 F.3d 1185, 1190 (10th Cir. 2005).

#### 1. Jury Instructions and Verdict Form: Breach of Contract

We first consider whether the jury instructions, as a whole, correctly stated the

governing law and provided the jury with ample understanding of the breach of contract

claim issues.  The court provided these instructions to the jury:

INSTRUCTION NO. 14

In order to find for Plaintiff on its claim for breach of contract, you must
first find that Plaintiff has proven, by a preponderance of the evidence, that

1.  The parties entered into a contract; and
2.  Plaintiff fulfilled its obligations under the contract; and
3.  Defendant breached its contractual obligations to Plaintiff; and
4.  Plaintiff suffered damages as a result.

*       *       *

INSTRUCTION NO. 15

A contract is formed only if the parties have completely assented to
identical terms.  Therefore, if you find that the parties did not come to a
complete understanding and agreement on any of the material terms of the
contract, then you must find that no contract was formed.

*       *       *

INSTRUCTION NO. 17

The terms of a contract may be express or implied.  A contract may contain
both express and implied terms.  In express terms, the parties reach their
agreement by spoken or written words.  In implied terms, the agreement is
implied from the parties' acts and conduct.  Implied terms may also be
shown by custom and usage.

(Appellant's App'x Vol. II at 398, 399, 401.) Ensil also requested an instruction

containing the following language:

A contract requiring a party to engage in the commission of an illegal act is
not an enforceable contract.  Unauthorized copying of copyrighted or
proprietary software/firmware is an illegal act.

(Appellant's App'x Vol. I at 340.)  The judge refused to give it as offered.  Instead he

crafted an instruction (Instruction No. 34A), which was modified as requested by the

parties. As given, it read:

> In a trial, parties offer evidence which may relate to fact issues, legal issues, or both. The jury decides fact issues and the Court resolves legal issues. During the course of this trial, evidence has been presented concerning the legality of copying software/firmware on PROMS. This is a legal issue for the Court to decide. Accordingly, I now instruct you that, in reaching your verdict on Plaintiff's breach of contract claim, you are not to base your decision on a determination of whether such conduct is legal or illegal. You may, however, consider this evidence for all other purposes, including, for example, whether the parties agreed that Defendant would copy software/firmware on PROMS as part of any contract.

(Appellant's App'x Vol. II at 417.)

These instructions correctly apprised the jury on the elements of BC's claim under Utah law. *See Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) (listing "the elements of a prima facie case for breach of contract"). "It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract." *Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996). "An agreement cannot be enforced if its terms are indefinite or demonstrate that there was no intent to contract." *Id.*

Considering the jury instructions as a whole, the jury was properly instructed. Instruction 34A specifically permitted the jury to consider evidence concerning possible illegality of copying software in determining whether copying PROMs was part of the contract. Ensil could have, and did, argue the parties did not agree to copy and replace PROMs because of potential illegality. The jury apparently concluded the possible illegality was either not considered by the parties or was not important to them. Ensil was neither unfairly prejudiced by the absence of a more specific instruction nor deprived

- 21 -

of a relevant defense. *See Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002) ("A faulty jury instruction requires reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations, and (2) when a deficient jury instruction is prejudicial.") (citations and quotations omitted). Neither prong has been satisfied.

2. Jury Instructions and Verdict Form: Illegality

Ensil nonetheless argues "[t]he District Court's refusal to give the jury instruction offered by Ensil and its insistence on giving a jury instruction that told the jurors they should not consider whether the copying software/firmware was illegal, together with its refusal to include a question on the verdict form whether Ensil agreed to copy PROMS . . . was highly prejudicial to Ensil." (Appellant's Opening Br. at 46-47.)

Under Utah law, the legality of a contract is one for the court to decide. *See Peterson*, 48 P.3d at 928 ("The *court* must determine (1) what the terms of the contract are; (2) what the statute prohibits; and (3) whether the statute or public policy demands that the contract be deemed unenforceable.") (emphasis added). Instruction 34A succinctly stated the governing law. There was no abuse of discretion in rejecting Ensil's requested instruction. *See Stiger*, 413 F.3d at 1190.

3. Jury Instructions and Verdict Form: Lost Profits

Instruction 39 addressed lost profits damages: "Damages for lost profits must be proven with reasonable certainty and the amount by a reasonable, though not necessarily

precise, estimate."[19]  (Appellant's App'x Vol. II at 422.)  Ensil objected to the instruction

and proposed an alternative:

> Loss of anticipated profits of a business venture involve so many factors of uncertainty that ordinarily profits to be realized in the future are too speculative to base an award of damages thereon. In the absence of sufficient certainty that damages were actually suffered, there can be no recovery for damages relating to lost profits.

(Appellant's App'x Vol. I at 347.)  Ensil's proposal relied on *First Sec. Bank of Utah,*

*N.A. v. J.B.J. Feedyards, Inc.*, which states:

> The basic and general rule is that loss of anticipated profits of a business venture involve so many factors of uncertainty that ordinarily profits to be realized in the future are too speculative to base an award of damages thereon.  The other side of the coin is that damages to a business or enterprise need only be proved with sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered.

653 P.2d 591, 596 (Utah 1982) (quoting *Howarth v. Ostergaard*, 515 P.2d 442 (Utah

1973)).

The damage instruction, while terse, was adequate and accurate.  The phrase

_____

[19] The instruction was based on *Carlson Distrib. Co. v. Salt Lake Brewing Co., L.C.*, in which the Utah appellate court analyzed the evidence necessary to prove lost profits.  95 P.3d 1171, 1177 (Utah Ct. App. 2004).  It explained:

> Damages, to include lost profits, must be proven with reasonable certainty and the amount by a reasonable though not necessarily precise estimate. The evidence must not be so indefinite as to allow the jury to speculate freely as to the amount of damages or lost profits, but will be deemed sufficient to establish a basis for an award of damages for lost profits where the plaintiff has provided the best evidence available to him under the circumstances.  While the evidence must not be so indefinite as to allow the jury to speculate as to their amount, some degree of uncertainty is tolerable.

*Id.* (citations and quotations omitted).

"reasonable certainty" is similar enough in meaning to "sufficient certainty." It is unlikely the jury was misled.

## C. Testimony of BC's Damages Expert

Ensil next contends the district court abused its discretion under Rule 702 of the Federal Rules of Evidence in permitting BC's expert to testify about the damages it sustained. In Ensil's view, the expert's testimony and opinions lacked evidentiary support and the expert's principles and methods were unreliable. We disagree.

The then-applicable version of Federal Rule of Evidence 702[20] stated:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The framework for analyzing proffered expert testimony is found in the "*Daubert* trilogy:" *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); and *Truck Ins. Exch. v. Magnetek, Inc.*, 360 F.3d 1206, 1209 (10th Cir. 2004). "Analysis under [this framework] is intended to ensure that the evidence is both 'reliable' and 'relevant.'" *Id.* at 1210. "To determine the reliability of expert testimony, courts assess 'whether the reasoning or methodology underlying the testimony is

---

[20] Federal Rule of Evidence 702 was amended in 2011. Although the changes were intended only to improve the readability of the rule rather than "to change any result in any ruling on evidence admissibility," *see* Fed. R. Evid. 702 advisory committee's note, we apply the version of the rule applicable at the time of the trial.

scientifically valid.'" *Id.* (quoting *Daubert*, 509 U.S. at 592-93). We have summarized the plaintiff's burden to show the reliability of proffered expert opinions this way:

> The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements.

*Id.* at 1210 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

Ensil does not argue the judge applied the wrong legal test. Rather, it claims he erred in applying it. We review for an abuse of discretion, affording substantial deference to the judge's application of *Daubert*. *Id.* at 1210.

> In denying Ensil's motion in limine, the court wrote:

> The Court is required to evaluate expert testimony for relevance and reliability. The Court finds Mr. Kimber's testimony to be highly relevant to the issues being litigated. The Defendant's [sic] do not challenge Mr. Kimber's qualifications, but instead cite to the testimony of their own expert witness in an attempt to refute Mr. Kimber's calculations and assumptions. This is best addressed on cross-examination and by the testimony of their own expert at trial.

(Appellant's App'x Vol. II at 348-49) (footnote omitted). Ensil contends the testimony of BC's damages expert was unreliable because it was based on three unsupported assumptions: (1) all of the circuit boards BC sent to Ensil were repairable; (2) BC had willing buyers for the circuit boards; and (3) BC could not meet the demand because Ensil kept the boards. Ensil also challenges the expert's methodology; although he had sales data available from 1997 through at least 2006, he only used a five-month period to

project expected sales for the damages period. [21]

The expert's method was sufficiently sound. His opinion may have been based on disputed facts but it nonetheless satisfies Rule 702's reliability requirements.

> If the calculations upon which the loss of profits are based are *estimated in any reasonable way* and the underlying assumptions on which the [expert] relied *are not without support in the record*, the calculations may be upheld as a valid means of measuring loss of profits.

*Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1526 (10th Cir. 1984) (quoting *King & King Enters. v. Champlin Petrol. Co.*, 657 F.2d 1147, 1158 (10th Cir.1981)).

Kimber's assumption of reparability was supported by evidence from multiple sources. Although some of the evidence was disputed, one undisputed source was the testimony from Ensil's own employee.

Kimber's estimate of lost sales was based on two components. First, in order to estimate demand, he considered BC's (pre-contract) sales between January and May 2001. Second, he assumed BC's damages occurred in a twelve-month period beginning in June 2001 (the month all circuit boards should have been repaired according to Ensil's estimate) and ending in May 2002 (the latest possible date BC determined Ensil was unable to make the repairs). Kimber considered both factors in connection with

---

[21] Additionally, Ensil tersely asserts Kimber "calculated lost profits on more circuit boards than covered by the agreement between Ensil and BC Technical." (Appellant's Opening Br. 51.) Kimber's inclusion of additional boards in his estimate was due to the fact that BC sent two of its functioning boards to Ensil as models, one of which was damaged by Ensil. Thus, the damage expert's reference to two additional boards as part of his lost profits analysis was appropriate.

estimating the number of circuit boards BC could have sold had the boards been timely repaired and available as Ensil originally estimated (repaired within six to ten days after delivery).

Kimber had access to sales records from 1997 to 2006, but he did not include all of the data in his analysis. This omission made his testimony vulnerable. Ensil exploited the vulnerability by presenting evidence contrary to Kimber's assumptions and through cross examination. The assumptions were certainly subject to debate but had sufficient evidentiary support to pass the admissibility threshold. *See Aspen Highlands*, 738 F.2d at 1524; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The district court did not abuse its discretion in admitting Kimber's testimony.[22]

## IV. BC'S CROSS-APPEAL – NO. 09-4019

BC contends "sufficient evidence at trial with respect to both its conversion and breach of contract claims [was presented] to be awarded prejudgment interest . . . ." (Second Br. on Cross Appeal 47.)

We apply Utah law to the issue of prejudgment interest. *Loughridge v. Chiles Power Supply Co., Inc.*, 431 F.3d 1268, 1288 (10th Cir. 2005). We review the court's decision to deny prejudgment interest for an abuse of discretion, but we review "any statutory interpretation or legal analysis" pertinent to such an award *de novo*. *Id.; see*

---

[22] Since the expert testimony on damages was proper, we need not consider Ensil's argument that the damages were not sufficiently supported without expert testimony.

*also Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1085 (10th Cir. 2010) (applying the abuse of discretion standard to a denial of prejudgment interest).

The court declined prejudgment interest based upon Utah's "best judgment" rule. (Appellant's App'x Vol. II at 586-592.)  *See Iron Head Constr., Inc. v. Gurney*, 176 P.3d 453, 455 (Utah Ct. App. 2008), *rev'd*, 207 P.3d 1231 (Utah 2009); *Smith v. Fairfax Realty, Inc.*, 82 P.3d 1064, 1069 (Utah 2003).  The Utah Supreme Court recently explained when prejudgment interest is appropriate:

> [I]n *Fell v. Union Pacific Railway* . . . . [the Utah Supreme Court] held that prejudgment interest was appropriate where the injury and consequent damages are complete and can be ascertained as of a particular time and in accordance with fixed rules of evidence and known standards of value. More recently, we have stated that prejudgment interest may be proper when the loss has been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages. . . . Alternatively, prejudgment interest is ***not*** permissible in cases where the damages are incomplete and are peculiarly within the province of the jury to assess at the time of the trial.  This includes cases in which the fact finder is left to determine the amount of damages from a mere description of the wrongs done or injuries inflicted.

*Iron Head Constr. Inc. v. Gurney*, 207 P.3d 1231, 1233 (Utah 2009) (quotations and citations omitted) (emphasis added).

Thus, the focus under Utah law when awarding prejudgment interest is "the measurability and calculability of the damages."  *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 210 P.3d 263, 272 (Utah 2009); *see generally AE, Inc. v. Goodyear Tire & Rubber Co.*, 576 F.3d 1050 (10th Cir. 2009) (examining and applying Utah's standard for prejudgment interest and affirming the denial of prejudgment interest).  If the fact-finder is "without any clear factual information," and is "left solely to its discretion to

determine damages," prejudgment interest is not warranted.  *See Encon Utah,* 210 P.3d at 275 (quotations omitted).

For example, in *Cornia v. Wilcox*, competing experts disputed how missing cows, the product on which damages were based, were valued.  898 P.2d 1379 (Utah 1995). The court summarized the damage evidence:

> [T]he jury heard conflicting testimony from experts regarding the cattle's expected pregnancy rates, weight range, loss rates, and market prices.  In addition, the jury heard divergent evidence regarding the calves' expected gender, weight range, mortality rates, and market prices.  Plaintiffs could not establish these elements as a matter of fact, and thus the jury was free to use its best judgment in ascertaining and assessing the damages.

*Id*. at 1387.  Because "[w]ithout any clear factual information, plaintiffs' damages could not be measured by facts and figures or [be] calculated with mathematical accuracy," the trial court correctly refused to award prejudgment interest.  *Id.* (quotations omitted).

The nature of the damages here are similar to *Cornia*:  imprecise and not subject to mathematical certainty.  Conflicting evidence was presented regarding the date of breach of contract (and thus the date of conversion), the value of the boards, replacement costs, and the existence and amount of lost profits.  BC argued it was entitled to lost profits damages in the amount of $153,986 and replacement costs of $447,360 for the circuit boards.  The jury award of $159,100 is not sufficiently "measurable or calculable" to justify prejudgment interest under Utah law.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge
